[No. B150794. Second Dist., Div. One. Oct. 9, 2002.]

HOLLY ANN NEMARNIK, Plaintiff and Appellant, v.
THE LOS ANGELES KINGS HOCKEY CLUB, L.P., et al., Defendants
and Respondents.

**[Opinion certified for partial publication.*]**

*This opinion is certified for publication with the exception of the part designated as "Award of Costs."

632

**COUNSEL**

Law Offices of Martina A. Silas and Martina A. Silas for Plaintiff and Appellant.

Wilson, Elser, Moskowitz, Edelman & Dicker, Patrick M. Kelly, Steven R. Parminter and Shanel K. Yang for Defendants and Respondents.

**OPINION**

**ORTEGA, J.**—Plaintiff Holly Ann Nemarnik was injured when, during pregame warm-ups at a Los Angeles Kings ice hockey game, a puck flew off the ice and struck her in the mouth. Plaintiff sued the Kings (The Los Angeles Kings Hockey Club, L.P.), the National Hockey League, and the owners and operators of the ice hockey venue (California Forum, doing business as Great Western Forum, the Anschutz Corporation, Anschutz Properties, Inc., and Anschutz L.A. Venture, Inc.).[1]

---

[1] According to the complaint, the Anschutz defendants are joint venturers, part owners, and general partners of the Kings and were "involved in the ownership, leasing, maintenance, security and running of the subject venue where the injury took place[.]" Two other entities (Majestic/Anschutz Ventures, L.P. and Sports Holding, L. L. C.) were named in the complaint but were not served. Another defendant, Staff Pro, Inc. (the alleged provider of security at the Forum), settled with plaintiff before trial.

The trial court granted defendants' motion for nonsuit at the beginning of trial.[2] The trial court concluded, as a matter of law, that defendants were immune from liability under the primary assumption of risk defense. (*Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696].) The trial court also awarded defendants costs of $12,870.

Plaintiff has appealed from the judgment and order awarding costs. For the reasons that follow, we affirm.

### PLAINTIFF'S FACTUAL ALLEGATIONS

On April 18, 1999, plaintiff attended a Kings hockey game at the Forum. During the pregame warm-ups, several pucks were in play on the ice. Plaintiff had a fourth row, season ticket seat but could not see the ice because "there were more people congregating around her area than she had ever seen before. No ushers asked the crowd to go to their proper seats as required." Plaintiff "tried folding up her seat and sitting on the edge to obtain a clear view, but still could not see over the crowd the venue had allowed to form around and in front of her. [Plaintiff] was perplexed and distracted by the fact that she had never seen such a crowd form around her at any previous hockey game she had attended. She was unsure what to do about the situation. Ultimately, a puck did fly off the ice. [Plaintiff] was unable to see the puck come off the ice, heading directly toward her; she was unable to take evasive action. The hockey puck struck [plaintiff] in the mouth and face, causing severe injuries."

Plaintiff's theory of liability is that defendants were negligent in failing to prevent the spectators from milling around the ice during pregame warm-ups: "The suit was based on the fact that defendants, by allowing a crowd to form and to remain in an area where they were not supposed to be congregating, increased the normal risk inherent in attending a hockey game; i.e., while a puck leaving the ice might be a normal risk of attending a game, that risk was significantly increased by allowing the spectators' views to be blocked so that they could not see the puck coming, and take evasive action."

Due to the risk of hockey pucks leaving the ice during play, the Forum requires the usher staff to prevent latecomers from blocking the view of

---

[2]Pursuant to stipulation, "(1) A jury was deemed to have been sworn for purposes of Code of Civil Procedure section 581c; (2) The plaintiff was deemed to have made her opening statement of what the evidence would show consistent with the parties' oral and written arguments on all pretrial motions and briefs; (3) All remaining defendants were deemed to have made a motion for nonsuit on plaintiff's causes of action for negligence and premises liability; and (4) The parties' oral and written arguments on the pre-trial motions were considered to be their arguments on defendants' motion for nonsuit."

seated guests. The Forum's handbook for ushers and ticket takers states in part: "During game action you MUST stop latecomers from blocking the view of seated guests. Politely request all ticket holders to stand along the back wall (LOGE) or the base of the stairway (COLLONADE) until there is a stoppage of play. Following a whistle, instruct guests to quickly take their seats. All portals are to be kept clear." The handbook also states: "Approach people congregating around your section. Ask them if you can provide assistance in helping them find their seats. Politely remind them that no one may stand or congregate in or at the top of the aisles." The handbook further provides: "One of the primary functions of the guest services department is protecting the personal safety of all our guests. . . . [¶] . . . [¶] The safety of our guests and staff MUST be a constant concern of all of our employees. Be aware of all physical conditions in your work area at all times. Report any problems immediately to your supervisor or building staff."

Plaintiff's expert witness on security and crowd control, Forrest P. Franklin, believes defendants' failure to observe proper crowd control procedures during the pregame warm-ups fell below the standard of care for ice hockey rinks.

THE NONSUIT RULING

A. *Standard of Review*

■ A defendant is entitled to a nonsuit only if a trial court determines, as a matter of law, the plaintiff's evidence is insufficient to sustain a verdict. (Code Civ. Proc., § 581c.) In determining the sufficiency of the plaintiff's evidence, the trial court may not weigh the evidence or consider the credibility of witnesses. Instead, the court must accept as true the evidence most favorable to the plaintiff, and disregard any conflicting evidence. (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 444 [105 Cal.Rptr.2d 856].)

B. *Knight v. Jewett*

■ In 1992, the California Supreme Court examined "the proper application of the 'assumption of risk' doctrine in light of this court's adoption of comparative fault principles in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]." (*Knight v. Jewett, supra,* 3 Cal.4th at pp. 299-300.) *Knight* held that as between participants in a touch football game, recovery for a personal injury suffered by the plaintiff as a result of the defendant's careless or negligent behavior in knocking her over, stepping on her hand, and injuring her finger, was barred under the

primary assumption of risk doctrine. (*Id.* at pp. 320-321.) The court noted that the defendant's conduct was not reckless or so outside the range of the ordinary activity involved in playing touch football so as to breach any legal duty of care owed to the plaintiff. (*Ibid.*) *Knight* held that "a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability—only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in that sport." (*Id.* at p. 320, fn. omitted.)

As the court in *Knight* noted, earlier decisions had also applied the assumption of the risk defense to other contact sport-related injuries caused by the ordinary negligence of other players, under an inherent risk theory: "In some situations, . . . the careless conduct of others is treated as an 'inherent risk' of a sport, thus barring recovery by the plaintiff. For example, numerous cases recognize that in a game of baseball, a player generally cannot recover if he or she is hit and injured by a carelessly thrown ball (see, e.g., *Mann* v. *Nutrilite, Inc.* (1955) 136 Cal.App.2d 729, 734-735 [289 P.2d 282]), and that in a game of basketball, recovery is not permitted for an injury caused by a carelessly extended elbow (see, e.g., *Thomas* v. *Barlow* (1927) 5 N.J. Misc. 764 [138 A. 208].)" (*Knight v. Jewett, supra,* 3 Cal.4th at p. 316.)

*Knight* also recognized that, due to the inherent risk of injury, courts have also exempted sporting venues from the duty to eliminate conditions or conduct that otherwise might be viewed as dangerous, but are an integral part of the sport itself. In this regard, *Knight* stated: "As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. (See Civ. Code, § 1714.) Thus, for example, a property owner ordinarily is required to use due care to eliminate dangerous conditions on his or her property. (See, e.g., *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself. Thus, although moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them. (See generally Annot. (1987) 55 A.L.R.4th 632.) In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant. [¶] Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above

those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm. The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant. [Citation.]" (*Knight v. Jewett, supra,* 3 Cal.4th at pp. 315-316.)

C. *Inherent Risks to Spectators Posed by Flying Bats, Balls, and Pucks*

■ California courts have long held that the risk to spectators of being hit by an accidentally thrown bat or a foul ball is an inherent risk of baseball that is assumed by the spectator. (See, e.g., *Quinn v. Recreation Park Assn.* (1935) 3 Cal.2d 725, 729 [46 P.2d 144] [" '[O]ne of the natural risks assumed by spectators attending professional games is that of being struck by batted or thrown balls[.]' "].) While the stadium owes no duty to insure spectators against injury from flying bats or balls, the stadium must exercise ordinary care to protect spectators from such injuries. (*Ibid.*) According to the California Supreme Court, the stadium " 'is not obliged to screen all seats, because, as pointed out by the decisions, many patrons prefer to sit where their view is not obscured by a screen. Moreover, the management is not required to provide screened seats for all who may apply for them. The duty imposed by law is performed when screened seats are provided for as many as may be reasonably expected to call for them on any ordinary occasion [citations]; and if . . . a spectator chooses to occupy an unscreened seat, or . . . is unable to secure a screened seat and consequently occupies one that is not protected, he assumes the risk of being struck by thrown or batted balls; and if injured thereby is precluded from recovering damages therefor. . . .' " (*Ibid.*)

After *Quinn*, intermediate appellate courts initially differentiated between the common knowledge of the risk of injury to spectators at baseball games versus ice hockey games. Unlike the injured spectator in *Quinn* whose action was defeated by motion for directed verdict based on the assumption of the risk defense, the actions of two injured ice hockey spectators were not barred, as a matter of law, by the assumption of the risk defense. In *Thurman v. Ice Palace* (1939) 36 Cal.App.2d 364 [97 P.2d 999], the court reversed a directed verdict for the defendant ice rink, concluding the plaintiff spectator was entitled to a trial on whether the defendant had negligently failed to provide warnings or screens to protect against flying pucks. *Thurman* distinguished *Quinn*, the baseball case, stating: "It is not common knowledge that pucks used in ice hockey games are liable to be batted into the section occupied by the spectators. Indeed, the puck is ordinarily batted along the

surface of the ice, but in a baseball game the ball is ordinarily batted into the air rather than along the surface of the playing field." (*Thurman,* at p. 368.)

Ten years after *Thurman,* the defendant ice rink in *Shurman v. Fresno Ice Rink* (1949) 91 Cal.App.2d 469 [205 P.2d 77], "argued that the *Thurman* decision was in 1939, and since that time over 100,000 persons have seen ice hockey games and should be familiar with the method of playing it and should assume the risk, as is ordinarily done by occupants of baseball bleachers. [Citation.]" (*Id.* at p. 474.) While the appellate court in *Shurman* granted a new trial to permit the ice rink to show that its warning signs and safety netting were sufficient to absolve it of liability, the court refused to absolve the ice rink of liability, as a matter of law, under the assumption of the risk defense, stating: "[I]t cannot be held, as a matter of law, that the general public has, at this particular date, become so familiar with the hazards of this sport and of the actual appreciation of the seriousness of the risk as to bring them within the 'common knowledge' rule and under the doctrine of assumption of risk. [Citations.]" (*Id.* at p. 477.)

More than 50 years have elapsed since the *Thurman* and *Shurman* decisions, during which professional ice hockey has grown in popularity both in California and nationally. In the present case, it is undisputed that ice hockey spectators face a known risk of being hit by a flying puck. Plaintiff concedes "there is a risk of hockey pucks leaving the ice during play . . . ." In addition, plaintiff makes no contention that any player was negligent in hitting the puck into the stands.

## D. *Defendants' Duty to Plaintiff*

 Cognizant of the inherent risk to spectators of being hit by a flying puck, plaintiff states in her opening brief that she "did not contend that defendants had any legal duty to keep pucks from flying off the ice. She did, however, contend that defendants had a duty to eliminate those risks which could be eliminated or minimized without negatively impacting play; such as making sure spectators had an unobstructed view of the ice so that they could protect themselves in the event a puck did leave the ice during play. . . . ██ ██ Plaintiff argued that, while the risk of a hockey puck leaving the ice might be 'inherent' in the game; the risk of people with bad tickets sneaking down close to the ice, blocking spectators' views, and not being removed by security/ushers is not an 'inherent' risk of attending a professional hockey game."[3]

 Obstructions of view caused by the unpredictable movements of other fans are an inherent and unavoidable part of attending a sporting event.

---

[3]In her reply brief, plaintiff contends, apparently for the first time in this litigation, that the plexiglass barriers were inadequate and that defendants breached their duty to provide proper

Views are blocked whenever fans spontaneously leap to their feet or move to and from their seats.

In this case, plaintiff contends an unusually large number of people were milling around in front of the ice, blocking her view. She emphasizes that she is not complaining about a single hot dog vendor walking by, or a lone fan standing up to cheer. Instead, she states, "a huge crowd of fans was crammed into the aisles down near the front of the ice rink, where her assigned seat was located. . . . Thus, there is a strong inference that the people blocking [plaintiff's] view of the ice were not actually assigned to the seating area where they were congregating [i.e., if the seats were all *occupied*, those seats could not have belonged to the people congregating near the rink around [plaintiff].]" She claims "there was nowhere around her for this mass of fans to sit down; the seats were full; people were all standing in the aisle; they were blocking her view in all directions. There were even people standing in her own ticketed seats, and she had to shoo them away."

Plaintiff concedes that while it may be unreasonable to expect defendants "to keep *every single spectator* perfectly seated at all times[, o]r to prevent someone from getting up for [a] moment to go to the rest room[,]" defendants "can and should [be required] to prevent a huge crowd of people from congregating in and around the aisles down near the front of the arena, directly between the ice and the other spectators, while hockey pucks are in play."

As far as we are aware, however, no court has imposed a legal duty upon an athletic team, sports league, or sports arena to prevent large crowds of spectators, during pregame warm-ups, from congregating in the aisles near the front of the arena, or from blocking the views of seated spectators. We know of no published decision in which tort liability was upheld based upon the injured spectator's alleged inability to evade a flying bat, ball, or puck during pregame warm-ups due to the defendants' breach of its duty to prevent other fans from obstructing the plaintiff's view.

Plaintiff contends that if we impose upon defendants the duty to prevent large crowds of fans from congregating in front of the ice during pregame warm-ups, whether the breach of that duty was the legal cause of her injury

---

stadium design. We need not reach these issues, which were not properly preserved for appeal. A party's failure to raise an issue below and in its opening brief constitutes a waiver. (*Imperial Bank v. Pim Electric, Inc.* (1995) 33 Cal.App.4th 540, 546 [39 Cal.Rptr.2d 432].) Accordingly, "the cautionary rule (that suggests that in keeping with the object of the nonsuit procedure, the plaintiff should ordinarily be given an opportunity, after the motion is made, to modify or add to it) is inapplicable to the case at bench. [Citation.]" (*John Norton Farms, Inc. v. Todagco* (1981) 124 Cal.App.3d 149, 162 [177 Cal.Rptr. 215].)

is a jury question. According to plaintiff, the trial court erred in concluding her injury was caused not by the obstruction of her view, but by the inherent risk of being hit by a flying puck.

Plaintiff, however, failed to contend in her opening statement that if she had a clear line of sight, she would have been able to avoid the flying puck. In other words, she claimed defendants' poor crowd control had increased her risk of injury by lessening her chances of evading the puck. Given that flying pucks are an integral and unavoidable part of the sport, however, it would be purely speculative to conclude that poor crowd control was causally related to plaintiff's injury. Based on plaintiff's opening statement, the trial court correctly concluded, as a matter of law, she was not injured because of poor crowd control, but due to an integral aspect of ice hockey—flying pucks. Accordingly, like the trial court, we conclude the relevant issue is not whether defendants owed a duty to provide better crowd control,[4] but whether defendants owed a duty to eliminate the risk of injuries from flying pucks.

Although not quite on point, *Neinstein v. Los Angeles Dodgers, Inc.* (1986) 185 Cal.App.3d 176 [229 Cal.Rptr. 612], persuades us defendants owed no such duty. In *Neinstein,* a Dodger fan injured by a foul ball sued the Dodgers, claiming the defendant was negligent in failing to protect her. In affirming summary judgment for the defendant, Division Two of this district stated in part: "We think it appropriate at this juncture to narrow the focus of this case by stating what is *not* at issue. Plaintiff makes no contention that any liability on the part of the Dodgers rests on the notion that the particular player who hit the ball was negligent in so doing. [¶] Nor does our review involve us in the Dodgers' duty to provide a premises free from the myriad of hazards which may exist in any large multi-level structure or which inheres in the conduct of any of the various activities which go on there besides the play of the game itself. [¶] The simple issue here is whether the owner of a baseball stadium has a duty to protect spectators from the natural hazards generated by the way in which the game itself is played. In determining whether an individual, such as plaintiff, should be compensated for his or her injury and in crafting a rule which would permit or reject such compensation there is a group of persons other than the immediate parties whose interests are worthy of consideration. Those are the literally millions of persons who attend baseball games all over the country. [¶] The quality of a spectator's experience in witnessing a baseball game depends on his or her proximity to the field of play and the clarity of the view, not to mention the

---

[4]To impose upon defendants a legal duty to prevent spectators from blocking the views of other spectators would be an impossible task. As defendants point out, no tall persons could stand, walk, or sit in front of shorter persons.

price of the ticket. [¶] As we see it, to permit plaintiff to recover under the circumstances here would force baseball stadium owners to do one of two things: place all spectator areas behind a protective screen thereby reducing the quality of everyone's view, and since players are often able to reach into the spectator area to catch foul balls, changing the very nature of the game itself; or continue the status quo and increase the price of tickets to cover the cost of compensating injured persons with the attendant result that persons of meager means might be 'priced out' of enjoying the great American pastime. [¶] To us, neither alternative is acceptable. In our opinion it is not the role of the courts to effect a wholesale remodeling of a revered American institution through application of the tort law." (*Id.* at pp. 180-181.)

Similarly, in this case, if we were to impose a duty upon defendants to eliminate all risk of injury from flying pucks, we would force defendants to do either of two things: provide a floor to ceiling protective screen around the rink, thereby reducing the quality of everyone's view; or increase the price of tickets to cover the increased liability costs. Like the court in *Neinstein*, we find neither alternative to be acceptable.

Plaintiff relies upon *Lowe v. California League of Prof. Baseball* (1997) 56 Cal.App.4th 112 [65 Cal.Rptr.2d 105], to support her position that triable issues of fact remain in this case because having one's view blocked by large crowds of spectators is not an inherent risk of the game. In *Lowe*, the plaintiff's seat was along the left field foul line. The home team's mascot (Tremor, a seven-foot-tall dinosaur character with a protruding costume tail) was "performing his antics" while standing immediately behind the plaintiff's seat. (*Id.* at p. 114.) With his large costume tail, Tremor repeatedly struck the plaintiff on the back of the head and shoulders. Distracted by this contact, the plaintiff turned around to see what was hitting him. Just as the plaintiff turned his attention back to the game, he was hit in the face by a foul ball.

The trial court in *Lowe* granted the defendants' motion for summary judgment, applying the primary assumption of risk doctrine of *Knight v. Jewett, supra,* 3 Cal.4th 296. The appellate court reversed, stating that while foul balls are an "inevitable or unavoidable" feature of the game, the antics of a mascot are not. (*Lowe v. California League of Prof. Baseball, supra,* 56 Cal.App.4th at p. 123.) The court pointed out that if "foul balls were to be eliminated, it would be impossible to play the game. Thus, foul balls represent an inherent risk to spectators attending baseball games. Under *Knight*, such risk is assumed. Can the same thing be said about the antics of the mascot? We think not. Actually, the declaration of . . . the person who dressed up as Tremor[] recounted that there were occasional games played

when he was not there. In view of this testimony, as a matter of law, we hold that the antics of the mascot are not an essential or integral part of the playing of a baseball game. In short, the game can be played in the absence of such antics. Moreover, whether such antics increased the inherent risk to plaintiff is an issue of fact to be resolved at trial." (*Ibid.*)

The facts in *Lowe* are unusual, given that the plaintiff was distracted by the antics of a costumed mascot standing behind his seat. In this case, however, no one in defendants' employ had distracted or caused plaintiff to turn away from the ice.

Plaintiff contends that under *Lowe*, the primary assumption of risk defense does not apply to these facts because having one's view blocked by large groups of spectators congregating near the ice is not an inevitable or unavoidable feature of the game. Just as baseball can be played without the antics of a costumed mascot, plaintiff claims ice hockey can be played without allowing large crowds of spectators to stand in front of the ice. Plaintiff claims that while the risk of being hit by a puck is an assumed risk, the risk of having one's view blocked by other spectators is not.

Primary assumption of the risk, however, was a theory adopted by the California Supreme Court in order to address "the proper application of the 'assumption of risk' doctrine in light of this court's adoption of comparative fault principles in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]." (*Knight v. Jewett, supra,* 3 Cal.4th at pp. 299-300.) Although defendants mentioned several ways in which plaintiff could have reduced her risk of injury (she could have summoned an usher to remove the other spectators, she could have moved to another part of the arena until the crowd lessened, she could have sat in a seat farther from the ice), we do not assign any comparative negligence to her conduct. Comparative fault does not apply to a spectator hit by a foul ball or hockey puck, because "plaintiff's conduct did not constitute 'fault' and thus could not be 'compared' to anything. . . . It is neither negligent nor blameworthy to attend a ball game and sit in a 'good seat' in the unscreened area." (*Neinstein v. Los Angeles Dodgers, Inc., supra,* 185 Cal.App.3d at p. 183.) Comparative fault, as *Neinstein* pointed out, "is not applicable under these circumstances, notwithstanding some abstract duty on the part of the stadium owner to provide a number of screened seats to accommodate persons who might ask for them." (*Id.* at p. 184.)

In any event, *Knight v. Jewett*'s primary assumption of risk analysis, as relevant to this appeal, involves a duty analysis similar to that of the baseball spectator injury cases, *Quinn v. Recreation Park Assn., supra,* 3 Cal.2d 725,

and *Neinstein v. Los Angeles Dodgers, Inc., supra,* 185 Cal.App.3d 176. This is a case where, as stated in *Knight v. Jewett, supra,* 3 Cal.4th at page 315, "defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself," and have done nothing to increase the risks inherent in the sport. Just as stadium owners owe no duty to eliminate the risk of injury from foul balls, we similarly conclude defendants owe no duty to eliminate the inherent risk of injury from flying pucks.

Accordingly, we affirm the trial court's ruling of nonsuit.

### AWARD OF COSTS*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

We affirm the judgment. Defendants are awarded costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

---

*See footnote, *ante*, page 631.