[No. E033904. Fourth Dist., Div. Two. June 10, 2004.]

MAINTAIN OUR DESERT ENVIRONMENT, Plaintiff and Appellant, v.
TOWN OF APPLE VALLEY, Defendant and Respondent;
PLUTO DEVELOPMENT, INC., Real Party in Interest and Respondent. ■

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

† Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts A.2.c. and B.

434

COUNSEL

Johnson & Sedlack, Raymond W. Johnson and Carl T. Sedlack for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Craig C. Thompson and Susan L. Durbin, Deputy Attorneys General, for the State of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Singer & Coffin and M. Neil Singer for Defendant and Respondent.

Morrison & Foerster, Michael H. Zischke, Donna R. Black, Scott B. Birkey and Kristin M. Kellet for League of California Cities as Amicus Curiae on behalf of Defendant and Respondent.

Gresham, Savage, Nolan & Tilden, John C. Nolan and Jennifer M. Guenther for Real Party in Interest and Respondent.

## OPINION

**RAMIREZ, P. J.**—Plaintiff Maintain Our Desert Environment (MODE) appeals from the denial of its petition for a writ of mandate seeking to compel defendant Town of Apple Valley (Town) to set aside actions that it took to approve a development project (Project) proposed by real party in interest, Pluto Development, Inc. (Pluto). MODE asserts that the trial court erred when it denied the writ because Town did not comply with mandatory provisions of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) prior to approving the Project. We disagree and affirm.

### FACTS AND PROCEDURAL HISTORY

After first conducting some preliminary investigations relative to the site, on October 9, 2001, Pluto submitted applications to Town for permits to construct the Project, a 1.2-million-square-foot distribution center with related outbuildings, on a 300-acre site on the southeast corner of Dale Evans Parkway and Johnson Road in Town. At that time, Lilburn Corporation submitted an initial environmental study for the Project, finding that it may have a significant effect on the environment and that an environmental impact report (EIR) was required.

On October 12, 2001, Town published notices of public hearing, one for consolidating parcels of land, one to amend the general plan and zoning designations for the Project site, and another to approve a conditional use permit and a development permit for the Project, indicating that no EIR was required for these actions. However, within days Town realized that the public hearing had been prematurely noticed and prepared a notice of preparation indicating that it would be the lead agency for the preparation of an EIR for the Project. At the time of the originally scheduled public hearing, it was announced that the items had been tabled and that they would be readvertised for a future hearing date.

Lilburn Corporation completed a draft EIR. A notice of completion and environmental document transmittal form was prepared on March 26, 2002,

and was forwarded to the state clearinghouse for distribution. A notice of public hearing was published on March 29, 2002, indicating that the Town planning commission would consider the Project on May 15, 2002, at 7:00 p.m. in the Town council chambers. The notice indicated that the Project may have a significant impact on the environment, and that an EIR had been prepared and could be reviewed at the Town planning commission. Another notice published on March 29, 2002, which appears to have been mailed to impacted property owners, further identified the environmental effects as being in the area of aesthetics, air quality, land use and noise, and indicated that comments regarding the development must be received by May 15, 2002. A public notice of availability of the draft EIR was prepared on April 29, 2002. A revised public notice of availability was prepared the following day extending the comment period to May 31, 2002. That notice advised of the planning commission hearing on May 15, 2002, and a Town council public hearing on June 11, 2002. An additional notice of public hearing for the June 11, 2002, hearing was prepared and published on May 3, 2002.

On May 15, 2002, the planning commission heard public comments and deferred action until May 31, 2002. At that time, after additional opportunity for public comment, the planning commission voted to recommend that the Project be approved.

The final EIR was prepared in June 2002. On June 5, 2002, findings were prepared that included the adoption of a statement of overriding concerns with respect to seven environmental impacts that could not be reduced to less than significant levels, even with mitigation.

On June 11, 2002, the Town council heard public comment and then voted to continue the public hearing to June 25, 2002. At that time the Town council heard only positive comments from the public and voted to certify the EIR, to adopt the statement of overriding concerns and to approve the Project. A notice of determination was prepared for filing with the County of San Bernardino on June 25, 2002, indicating that Town had approved the Project, had made findings, had required mitigation and had adopted a statement of overriding concerns. An ordinance amending the zoning for the Project was adopted by the Town council on July 9, 2002.

On July 23, 2002, MODE filed a verified petition for writ of mandate. It sought to set aside Town's (1) certification of the EIR; (2) adoption of a statement of overriding considerations; (3) approval of the development permit; (4) approval of a general plan amendment and zone change; (5) approval of a tentative parcel map; and (6) approval of temporary and permanent conditional use permits, all based on Town's failure to first comply with CEQA. The petition identified nine causes of action including that

(1) the Project description was inadequate because it did not disclose potential impacts of the Project; (2) potential significant environmental impacts were not adequately considered or mitigated in the EIR; (3) mitigation measures were improperly deferred; (4) feasible mitigation was not adopted; (5) mitigation adopted was uncertain to mitigate environmental impacts; (6) requirements for evaluating the adequacy of the water supply were not complied with; (7) environmentally superior Project alternatives were rejected without substantial evidence; (8) the EIR failed to consider cumulative and growth inducing impact of the Project; and (9) the findings regarding significance of environmental impacts, feasibility of mitigation and alternatives, general plan consistency, and in support of the statement of overriding considerations were not supported by substantial evidence.

Next, MODE sought a temporary restraining order to halt the Project pending the outcome of the writ petition. That motion was denied. MODE thereafter sought to disqualify the trial court judge under Code of Civil Procedure section 170.6. That motion was also denied. Then MODE filed a request for a preliminary injunction seeking to halt work on the Project. The trial court heard argument on the preliminary injunction on December 9, 2002, but did not rule until March 5, 2003, enjoining construction, grading and landscaping until further order of the court. The order was signed on March 12, 2003.

In the meantime, the parties argued the merits of the petition for writ of mandate. However, to allow additional briefing, the trial court continued the hearing. It was at the continued hearing that the preliminary injunction was granted pending the trial court's decision on the writ petition. That decision, denying the writ and vacating the injunction, was issued on May 7, 2003. Judgment was entered on June 6, 2003. This appeal followed.

## DISCUSSION

### A. *Exhaustion of Administrative Remedies*

#### 1. *MODE's Members Objected to the Project*

██ Town argues that MODE has no standing to seek a writ because it has failed to demonstrate that it exhausted its administrative remedies by presenting its objections to the Project during the comment period as required by Public Resources Code section 21177.[1] In response, MODE first claims that

---

[1] "(a) No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to

Town has failed to file a cross-appeal and therefore cannot challenge the trial court's ruling that MODE had standing to file its petition. However, in order to obtain a reversal of the trial court's judgment, MODE must demonstrate that the trial court committed prejudicial error. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.) A respondent may, without appealing, seek review of any trial court decision to show that the appellant was not prejudiced for the reasons claimed. (Code Civ. Proc., § 906.) Thus, Town may raise the issue of MODE's standing in order to demonstrate that MODE was not prejudiced by any error that the trial court may have made in denying its writ on the grounds MODE claims.

■ Still, Town's argument is not persuasive. Public Resources Code section 21177 recognizes that its exhaustion requirement is satisfied if a member of an organization formed after project approval objected to approval of the project during the public comment period. (Pub. Resources Code, § 21177, subd. (c).) It also specifically does not apply if the public agency failed to give the notice required by law. (Pub. Resources Code, § 21177, subd. (e).) MODE invoked both of these exceptions.

In its verified petition, MODE identified itself as "an after-formed unincorporated association of local . . . residents . . ." some of whom submitted comments opposing approval of the Project. Tony Thomas, Robin Brussel, Eydie Brussel, Felice Asti and Debra Hutton were identified as members of MODE. The first three presented objections to the Project, while the others did not. Still, only one member need have objected, and that has been demonstrated. Therefore, MODE is not precluded from seeking to set aside Town's approval of the project for failure to comply with CEQA. As this ground is sufficient, we need not discuss MODE's argument that Town failed to give the notice required by law in conjunction with this argument.

the close of the public hearing on the project before the issuance of the notice of determination.

"(b) No person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination.

"(c) This section does not preclude any organization formed after the approval of a project from maintaining an action pursuant to Section 21167 if a member of that organization has complied with subdivision (b).

"(d) This section does not apply to the Attorney General.

"(e) This section does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, or if the public agency failed to give the notice required by law." (Pub. Resources Code, § 21177.)

2. *Grounds upon Which MODE May Challenge Certification of the EIR*

Town also points out that Public Resources Code section 21177, subdivision (a) allows its approval of the Project to be challenged only on those alleged grounds for noncompliance with CEQA that were presented to it orally or in writing during the public comment period. This statute permits any person who objected to raise any ground asserted as an objection by any other objecting party. *(Ibid.; Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1262 [100 Cal.Rptr.2d 301].) In their writ petition, MODE alleged nine deficiencies in Town's compliance with CEQA. Prior to determining whether MODE exhausted its administrative remedies as to these deficiencies, we must again consider one of the exceptions to the requirement that an issue have been raised during the public comment period prior to being raised in a subsequent court challenge. MODE asserts that it may raise any issue because Town failed to give the notice required by law. (Pub. Resources Code, § 21177, subd. (e).)

█ Public Resources Code section 21092, subdivision (a) provides that any lead agency preparing an EIR must notify the public of that fact "within a reasonable period of time prior to certification of the [EIR] . . . ." The notice is required to include (1) the period during which comments will be received on the draft EIR; (2) the date, time and place of any public meetings or hearings on the project; (3) a brief description of the project and its location; (4) any anticipated significant environmental effects of the project; and (5) the address where the draft EIR and its supporting documents may be reviewed. (Pub. Resources Code, § 21092, subd. (b)(1).) The notice is required to be given to those who have requested it and must be either (1) published in a newspaper of general circulation in the area affected by the project; or (2) posted "on- and off-site in the area where the project is to be located"; or (3) directly mailed to contiguous property owners and occupants. (Pub. Resources Code, § 21092, subd. (b)(3)(A)–(C).)

In its opening brief, MODE's arguments mirror those that it raised below: that Town's notices were deficient in that the project description was inadequate because it did not identify Wal-Mart Stores, Inc. (Wal-Mart) as the end user of the Project and in that it did not list the significant environmental impacts of the Project. In its reply brief on appeal, MODE for the first time claims that the notice was deficient in several other respects.

a. *Town's Notice Listed Significant Environmental Impacts*

First, MODE's failure to raise points below and failure to raise them on appeal prior to the reply brief result in a waiver of those claims. *(Iliff v. Dustrud* (2003) 107 Cal.App.4th 1201, 1206 [132 Cal.Rptr.2d 848];

*Nemarnik v. Los Angeles Kings Hockey Club* (2002) 103 Cal.App.4th 631, 638, fn. 3 [127 Cal.Rptr.2d 10].) We need not discuss them. Next, the record demonstrates that the notices Town provided met the requirements of CEQA. On March 29, 2002, Town prepared a notice of public hearing indicating (1) that the public review period would be from March 29, 2002, through May, 15, 2002 (48 days); (2) that a public meeting would be held on Wednesday, May, 15, 2002, at 7:00 p.m. at the Town council chambers located at 14955 Dale Evans Parkway in Apple Valley, CA 92307; (3) that the project was "an approximately 1,100,000 square foot warehouse with expansion capabilities of an additional 167,000 square feet; support space to house administrative offices; internal office/support area; and aerosol product storage. The proposed facility includes a truck maintenance yard, washing and fueling facility; and tractor-trailer parking and associated dock areas," as well as above and underground fuel, oil and water storage tanks, at the southeast corner of Dale Evans Parkway and Johnson Road; (4) that the project may have a significant environmental impact in the areas of aesthetics, air quality, land use and noise; and (5) that the draft EIR could be reviewed at any of three listed addresses. Thus, the notice contains all of the information required by CEQA. Further, despite MODE's assertions to the contrary, the record indicates that this notice was both published on March 29, 2002, and mailed to a long list of public agencies and property owners on April 1, 2002. This single notice therefore appears to have complied with all of the requirements of Public Resources Code section 21092.[2] The fact that it was titled a notice of public hearing and review rather than a notice of availability (it appears that Town used the former to notify the general public of the EIR and the latter to notify government agencies) is meaningless. CEQA does not require use of a certain title and the law does not place form above substance. (Civ. Code, § 3528.)

Town also prepared and published a notice of the June 11, 2002, Town council meeting. While that notice did not list the specific areas of significant environmental impact, it did indicate that such impacts may exist. It also failed to state the review period, but contained information on the Project, the public hearing and the location where the draft EIR could be reviewed. In essence, this notice was merely a supplement to the March 29, 2002, notice, informing of an additional hearing date as required by Public Resources Code section 21092, subdivision (b)(1). The two notices, in conjunction, appear to have provided all of the information that CEQA requires.

---

[2] MODE rather disingenuously argues that the absence of the second page of the notice in the exhibit after the affidavit of mailing at page 1104 of the administrative record demonstrates that the second page of the notice was not mailed. We disagree. The second page of the notice exists at page 453 of the administrative record in the same exhibit as returned envelopes postmarked April 1, 2002. Those envelopes bear addresses listed in the affidavit of mailing. This strongly indicates that the second page of the notice attached to the affidavit of mailing was merely inadvertently not photocopied when the administrative record was prepared.

b. *CEQA Does Not Require Listing a Project End User in the Project Description Required by Public Resources Code Section 21092*

Next, MODE and the Attorney General, in his amicus curiae brief, claim that the notice was inadequate because it did not specifically identify Wal-Mart as the end user of the Project. There are actually two issues involved in this point. The first one deals with what is adequate for the "brief description of the proposed project and its location" required by Public Resources Code section 21092, subdivision (b)(1). The second issue involves the adequacy of the project description in the EIR as required by California Code of Regulations, title 14, section 15124.[3] We will discuss the first issue here and reserve analysis of the second issue for later in this opinion.

■ There is no case law interpreting the "brief description of the proposed project" language of Public Resources Code section 21092. Therefore, we must determine the Legislature's intent by applying rules of statutory construction. (Code Civ. Proc., § 1859.) That intent is exhibited by the ordinary and plain meaning of the words used. However, if the words are ambiguous, we may consider the ostensible aims to be achieved by the legislation and the legislative history. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 59 [124 Cal.Rptr.2d 507, 52 P.3d 685]; *Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 [120 Cal.Rptr.2d 795, 47 P.3d 639].)

■ The key word here is "brief." This is not an ambiguous term. Webster's Third New International Dictionary (1993) at page 277 defines "brief" as being short, concise or succinct. "Concise" is defined as being "marked by brevity in expression or by compact statement without elaboration or superfluous detail" and "succinct" is similarly defined as "marked by brief and compact expression or by extreme compression and lack of unnecessary words and details." (*Id.* at pp. 471, 2282.) "Brief" is also defined as implying a summary. (*Id.* at p. 277.) Thus, in choosing to use that word, the Legislature suggested that the project description contained in the public notice need not be as extensive as the description in the EIR itself, but need only be a brief, compact summary without elaboration or detail. We cannot presume that it intended that the project description do more than necessary to fulfill the purpose of the statute. Ultimately, that aim is to alert the public

---

[3] Our Supreme Court has not determined that the CEQA guidelines found at California Code of Regulations, title 14, section 15000 et seq. are binding. However, it has pronounced that they are entitled to "great weight . . . except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).)

of a project's purpose and location so that interested persons may further review and comment upon its potential environmental impacts, if they so desire. It is not necessary then, to effectuate the purpose of the statute that the phrase "brief description of the proposed project" be defined to require disclosure of the end user of the project. We may not read into a statute more than what the Legislature has plainly stated therein. (Code Civ. Proc., § 1858.)

The Attorney General has cited *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1150 [249 Cal.Rptr. 439], for the proposition that an incomplete and misleading project description can result in a lack of notice so as to eliminate the need to exhaust administrative remedies. In that case, the public entity sought to acquire land that was owned by the federal government. Although the public entity was aware that the property was likely contaminated with polychlorinated biphenyls (PCB's) and other toxic substances, it determined that due to the nature of the transaction, it was categorically exempt from performing any environmental review. (*Id.* at pp. 1140–1142.) The Court of Appeal held that the public agency had impermissibly divided the "project" into segments (one, the acquisition of the property and two, the investigation and decontamination of the property) in order to avoid CEQA review. (*Id.* at p. 1146.) This division of the "real" project into segments was held to have resulted in the inadequate and misleading project description that the plaintiff relied on when interposing initial objections to the acquisition. (*Id.* at pp. 1141, 1150.) No misleading division of the Project has occurred here. The omission of a plan for inspection and decontamination of toxic wastes, an issue of clear environmental concern, cannot be likened to the omission of an end user's name, which of itself can have no possible environmental impact.

◼ Thus, we hold that MODE has failed to establish that Town did not provide the notice required by law. It therefore has not shown that it is excused from exhausting its administrative remedies. As a result, it may only forward those grounds for noncompliance with CEQA that were presented during the public comment period. (Pub. Resources Code, § 21177, subd. (a).)

 c. *Issues That MODE Has Standing to Address**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Adequacy of the EIR**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 430.

## C. *The Adequacy of the Project Description*

While there is an issue with respect to MODE's ability to raise this point, since it never complained to Town that the Project end user had not been disclosed, the Attorney General of California need not comply with the exhaustion of administrative remedies requirement. (Pub. Resources Code, § 21177, subd. (d).) Therefore, we now consider whether, in order to be adequate under CEQA, a project description must contain the identity of the end user of the proposed project.

█ An EIR is an informational document that is meant " 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citation.]" (*Laurel Heights, supra*, 47 Cal.3d at p. 391.) An adequate project description is important in that it ensures that CEQA's goals of providing information about a project's environmental impacts to government agencies and the public to allow consideration of mitigation measures and alternatives will not be rendered useless. (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 192–193, 197–198, 203 [139 Cal.Rptr. 396].) In this way, a project description that is "accurate, stable and finite . . . is the *sine qua non* of an informative and legally sufficient EIR." (*Id.* at p. 193.)

The Attorney General urges that the project description in this EIR is inaccurate because it identifies Pluto and not Wal-Mart as the Project proponent. The argument fails to note the difference between a project proponent/developer and a project user/tenant. It is common knowledge that projects are often developed without any knowledge of who the user/tenant will be. If CEQA were to be interpreted as the Attorney General suggests, no such projects could ever proceed until all potential user/tenants were identified and subsequently investigated by the lead agency. In addition to being completely impractical, this interpretation finds no support in the sphere of law and regulation encompassed by CEQA, as we now explain.

█ Once a project has been approved and an EIR has been certified, no further EIR can be prepared unless substantial changes are made to the project or the circumstances under which it is undertaken, or new information that could not have been known at the time of certification becomes available. (Pub. Resources Code, § 21166.) *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1017–1021 [100 Cal.Rptr.2d 413] (*Friends of Davis*) establishes that the fact that an end user is unknown at the time the EIR for a project is certified does not meet the criteria established by Public Resources Code section 21166. It follows that the identification of an end user is not so significant under CEQA that it must be done in order to comply with the law.

■ In addition, land use entitlements such as conditional use permits and development approvals run with the land and do not belong to the permittee. (*Malibu Mountains Recreation, Inc. v. County of Los Angeles* (1998) 67 Cal.App.4th 359, 367–368 [79 Cal.Rptr.2d 25]; *Sounhein v. City of San Dimas* (1996) 47 Cal.App.4th 1181, 1187–1188 [55 Cal.Rptr.2d 290].) And, California Code of Regulations, title 14, section 15301 provides a categorical exemption from CEQA review for "operation, . . . maintenance, . . . leasing, . . . or minor alteration of existing public or private structures, [or] facilities, . . . involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination." Thus, had Pluto developed the Project and then held it out for sale to any interested buyer, no additional CEQA review would have been necessary for the new owner so long as the use was consistent with that had already been approved. CEQA does not require "tenant-specific review of previously approved uses." (*Friends of Davis, supra*, 83 Cal.App.4th at p. 1014.) These facts strongly militate against interpreting CEQA to include a requirement that the end user of a project be identified. So long as the project is approved, CEQA has no concern about who uses it. If CEQA compliance required the identification of the project end user, a new EIR would need to be considered every time property was sold or a different tenant moved into a building, regardless of the use to which the property was to be put. In addition to the problems listed above, such a requirement also violates the standard of efficiency required by CEQA. (Pub. Resources Code, §§ 21003, subd. (f) & 21166; Cal. Code Regs., tit. 14, § 15003, subd. (g).)

■ Perhaps most importantly, CEQA guidelines provide that "[t]he description of the project [in the EIR] shall contain the following information but should not supply extensive detail beyond that needed for evaluation and review of the environmental impact. [¶] (a) The precise location and boundaries of the proposed project shall be shown on a detailed map, preferably topographic. The location of the project shall also appear on a regional map. [¶] (b) A statement of the objectives sought by the proposed project. A clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings or a statement of overriding considerations, if necessary. The statement of objectives should include the underlying purpose of the project. [¶] (c) A general description of the project's technical, economic, and environmental characteristics, considering the principal engineering proposals if any and supporting public service facilities. [¶] (d) A statement briefly describing the intended uses of the EIR. [¶] (1) This statement shall include, to the extent that the information is known to the lead agency, [¶] (A) A list of the agencies that are expected to use the EIR in their decision-making, and [¶] (B) A list of permits and other approvals required to implement the project. [¶] (C) A list of related environmental review and consultation

requirements required by federal, state, or local laws, regulations, or policies. To the fullest extent possible, the lead agency should integrate CEQA review with these related environmental review and consultation requirements. [¶] (2) If a public agency must make more than one decision on a project, all its decisions subject to CEQA should be listed, preferably in the order in which they will occur. On request, the Office of Planning and Research will provide assistance in identifying state permits for a project." (Cal. Code Regs., tit. 14, § 15124.) The guidelines thus do not require that the end user of the project be named in the project description.

Neither MODE nor the Attorney General has pointed us to any CEQA statute or guideline that requires that the end user of the proposed project be identified in order to achieve compliance. Considering our standard of review, the fact that naming the end user of the project is not specifically required by law makes it difficult for us to conclude that Town abused its discretion in certifying the EIR without that information. (*County of Inyo v. City of Los Angeles*, *supra*, 71 Cal.App.3d at p. 189.) Further, Public Resources Code section 21083.1 specifically states that "courts . . . shall not interpret [CEQA] or the state guidelines . . . in a manner which imposes procedural or substantive requirements beyond those *explicitly stated* in [CEQA] or in the state guidelines." (Italics added.)

Still, though they implicate no specific rule, MODE and the Attorney General point to the general rule that CEQA requires full disclosure of information so that all concerned are fully informed. (*Save Our Peninsula Committee v. County Bd. of Supervisors*, 87 Cal.App.4th 99, 118, 128 [104 Cal.Rptr.2d 326]; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 721–722 [32 Cal.Rptr.2d 704].) The omission of a bit of information like the name of the end user, they argue, results in less than "full disclosure" and therefore violates the spirit of CEQA, which, in turn, supports a conclusion that the lead agency has not proceeded in a manner required by law. For example, MODE cites *Laurel Heights*, *supra*, 47 Cal.3d at page 404 for the proposition that CEQA's fundamental goal is "that the public be fully informed . . . ."

 MODE cuts its citation short. The full sentence states that the public must be "fully informed *as to the environmental consequences* of action by their public officials." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 404, italics added.) That language is key. CEQA is concerned solely with the potential environmental impacts of a project. Therefore, in order to demonstrate that CEQA requires disclosure of the identification of the end user of a project, it is incumbent upon MODE and the Attorney General to demonstrate that the identity implicates potential physical environmental impacts. Information that has no bearing upon the physical environment has no business in an EIR.

(Cal. Code Regs., tit. 14, §§ 15124, 15382.) Further, in order to establish that the EIR was inadequate because it did not disclose Wal-Mart as the end user of the Project, MODE and the Attorney General must rely on something more than speculation. (*Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574, 1600 [45 Cal.Rptr.2d 822] (*Fort Mojave*) [speculation does not establish deficiency in EIR].)

 MODE first argues that failure to disclose Wal-Mart as the end user of the Project prevented "challenge by those individuals and organizations familiar with and opposed to Wal-Mart and its business, operations and anti-environmental practices." However, social, economic and business competition concerns are not relevant to CEQA analysis unless it is demonstrated that those concerns will have a significant effect on the physical environment. (Cal. Code Regs., tit. 14, §§ 15064, subd. (f)(6), 15131 & 15382; *Friends of Davis, supra,* 83 Cal.App.4th at p. 1019; *Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1229, 1235 [94 Cal.Rptr.2d 740].) The fact that a proposed tenant may give rise to public controversy and debate, absent some valid and factually supported environmental concern, does not implicate CEQA. (*Friends of Davis, supra,* 83 Cal.App.4th at p. 1020.)

MODE also speculates that the public "and others knowledgeable and concerned about environmental issues" may have come forward had they known that Wal-Mart was the end user of the Project. This amorphous, generic speculation is insufficient to carry the burden of proof that the EIR is legally inadequate. (*Friends of Davis, supra,* 83 Cal.App.4th at p. 1021 [environmental review is not supported by mere uncorroborated opinion or rumor]; *Fort Mojave, supra,* 38 Cal.App.4th at p. 1600.) The Attorney General makes the similar assertion that had the public known that the end user would be Wal-Mart they might have demanded "more information, more mitigation, or might even [have] opposed the project." This speculation does not demonstrate how such demands or opposition would forward the aims and purposes of CEQA by resulting in a better informed decision about environmental impacts. In essence the argument merely forwards the position that CEQA cares whether the public would be more likely to agree with Town's approval of an otherwise identical project if it were to be operated by a competitor as opposed to Wal-Mart. The crux of the issue is that the project itself, and therefore its environmental impact, is identical regardless of who will operate it. The only possible reasons for the public to object to accepting Wal-Mart but not a competitor under these circumstances have nothing whatsoever to do with the aims and purposes of CEQA.

 In deciding whether to approve a project, a public agency may not act in an arbitrary and capricious manner. (*San Franciscans Upholding the*

*Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 673 [125 Cal.Rptr.2d 745]; *Friends of Davis, supra,* 83 Cal.App.4th at p. 1013 ["Where certain uses are permitted, a city cannot arbitrarily exclude others who would employ a similar use."].) A public agency may not engage in conduct based upon personal, group or political animus without implicating constitutional concerns. (*Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1034–1036 [103 Cal.Rptr.2d 711, 16 P.3d 130]; *Friends of Davis, supra,* 83 Cal.App.4th at p. 1013 ["a city does not have carte blanche to exclude a retail merchant that it, or some of its residents, do not like"]; see also *Roman Cath. etc. Corp. v. City of Piedmont* (1955) 45 Cal.2d 325, 330–334 [289 P.2d 438] [zoning scheme that discriminates between otherwise identical public and private schools is arbitrary and unconstitutional].) Nor may the purposes of CEQA be subverted so that it acts as an instrument of oppression or delays social or economic development or advancement. (Cal. Code Regs., tit. 14, § 15003, subd. (j).)

MODE has identified only one specific Wal-Mart policy that it claims would have resulted in physical environmental impact for this Project. It asserts that Wal-Mart has a practice of scheduling deliveries by appointment only. This practice, MODE argues, results in drivers arriving early waiting on the side of the road or anywhere else they can park, resulting in major traffic and air quality impacts. This supposed policy, about which MODE provides no more information than unsupported speculation, finds no support in the EIR, which states that truck trips are scheduled based upon the needs of the receiving facilities and trucks may arrive and depart at any time of day or night. More importantly, the EIR considered the fact that "[v]ehicles reporting to the project site need to be able to enter the site so that congestion does not occur on the public street" and concluded that the Project allowed for an acceptable level of service. Further, the Project allows for onsite parking, not associated with loading dock doors, for up to 286 tractors and up to 2,334 trailers. MODE has not provided any evidence that the failure to identify Wal-Mart resulted in Town's failure to consider a significant environmental impact, and thus has failed to demonstrate that the EIR is inadequate.

Both MODE and the Attorney General claim that the failure to identify Wal-Mart as the end user of the Project compromised the trip generation data that the EIR relies upon because of use of figures from a "similar facility." They argue that the numbers could not be double-checked because the facility itself was never identified and neither was the actual Project proponent. Initially, we observe that Pluto was identified in the EIR as the Project proponent and the "similar facility" as a "Pluto owned facility" (the record identifies Pluto as a real estate division of Wal-Mart.) Interested parties could have investigated that entity and its "similar facility." MODE admits that Wal-Mart's competitors know that Pluto is its development division. It is not,

therefore, unrealistic to believe that with some investigation interested members of the public, who were well aware that the end user was not Pluto, could have achieved the same level of knowledge. As for the remaining inadequacies of this "similar facility" argument, we have already discussed them in our analysis of the traffic issues, in a portion of this opinion not ceritifed for publication.

Both MODE and the Attorney General claim that omission of the end user from the Project description resulted in a lack of knowledge about the environmental impacts of the Project based upon the known past environmental abuses of that end user. Though not acknowledged in any of the briefing, our Supreme Court has recognized that the environmental record of a project proponent can be a significant factor in determining whether its promises should be believed such that mitigation measures are likely to be adequate. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 420.) In that case, the record contained evidence that the project proponent had a blemished record with respect to its prior handling of radioactive materials, a potential concern with the proposed project. (*Ibid.*) The Supreme Court instructed that in balancing a project proponent's prior shortcomings against its promises for future action, "a court should consider relevant factors including: the length, number, and severity of prior environmental errors and the harm caused; whether the errors were intentional, negligent, or unavoidable; whether the proponent's environmental record has improved or declined; whether he has attempted in good faith to correct prior problems; and whether the proposed activity will be regulated and monitored by a public entity." (*Ibid.*) In the instant case, we cannot begin to evaluate these issues because neither MODE nor the Attorney General, even after learning that Wal-Mart intended to operate the Project, has provided any evidence to demonstrate that Wal-Mart has a blemished environmental record on any of the issues considered in the EIR for this Project. Again, all that has been presented to this court are unsupported theories, conjecture and innuendo about what might have been. That is insufficient to support a finding that the EIR was inadequate. (*Friends of Davis*, *supra*, 83 Cal.App.4th at p. 1021; *Fort Mojave*, *supra*, 38 Cal.App.4th at p. 1600.)

 Finally, both MODE and the Attorney General claim that the project end user is always environmentally relevant because its financial wherewithal bears upon the feasibility of mitigation measures and project alternatives. (Pub. Resources Code, § 21061.1.) This argument also fails on more than one level. With specific reference to this case, again, neither MODE nor the Attorney General has shown that expending more money would have made feasible any mitigation measure that the EIR found not feasible. On a broader level, what MODE and the Attorney General essentially claim is that CEQA should be interpreted to allow discrimination between project applicants for an identical project based upon financial status. This means that project proponents of little means do not have to worry about the environment

because they cannot afford to, but wealthier applicants do because they can. That this suggested interpretation of CEQA is absurd need hardly be stated. Economic unfeasibility is not measured by increased cost or lost profit, but upon whether the effect of the proposed mitigation is such that the project is rendered impractical. (*Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1181 [243 Cal.Rptr. 339].) The fact that a project costs too much to be profitable or cannot operate at a profit so as to render it impractical does not hinge on the wealth of its proponent. No proponent, whether wealthy or not, is likely to proceed with a project that will not be economically successful. But, if the project can be economically successful with mitigation, then CEQA requires that mitigation, regardless of the proponent's financial status. (*Ibid.*) ▮ Once more we must conclude that it has not been demonstrated that the EIR was inadequate because it omitted the fact that Wal-Mart was to be the end user of the Project.

Because we have so concluded, we need not discuss Town's theory that Wal-Mart's identity as the end user of the Project constituted a trade secret.

### Disposition

The judgment denying the writ of mandate is affirmed. Respondents to recover their costs on appeal.

Ward, J., and King, J., concurred.

On July 2, 2004, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 27, 2004.