Filed 1/7/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| MONICA MAYES, | |
| Plaintiff and Appellant, | E076374 |
| v. | (Super.Ct.No. RIC1820750) |
| LA SIERRA UNIVERSITY, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge. Reversed with directions.

Angelo & Di Monda and Joseph Di Monda for Plaintiff and Appellant.

The Lee Law Group, Ted M. Lee and Charles F. Nikolenko for Defendant and Respondent.

1

## I. INTRODUCTION

On April 22, 2018, plaintiff and appellant Monica Mayes was struck in the face by a foul ball while attending an intercollegiate baseball game between two private universities, Marymount University (Marymount) and defendant and respondent La Sierra University (La Sierra). Mayes suffered skull fractures and brain damage, among other injuries. When struck by the foul ball, Mayes was seated in a grassy area along the third-base line, behind the dugout, which extended eight feet above the ground, and there was no protective netting above the dugout.

Mayes sued La Sierra for her injuries, alleging a single cause of action for negligence. Mayes alleged that La Sierra was negligent for multiple reasons, including its failure to (1) install protective netting over the dugouts, (2) provide a sufficient number of screened seats for spectators, (3) warn spectators that the only available screened seats were in the area behind home plate, and (4) exercise crowd control in order to remove distractions in the area along the third-base line that diverted spectators' attention from the playing field.

La Sierra moved for summary judgment, claiming that the primary assumption of risk doctrine barred Mayes's negligence claim. The trial court agreed and granted the motion, observing that the case was "a textbook primary assumption of the risk case." We reverse. For reasons we explain, La Sierra did not meet its burden of showing that the primary assumption of risk doctrine barred Mayes's negligence claim. In addition, Mayes showed there were triable issues of material fact concerning whether La Sierra was negligent for the reasons she alleged in her complaint.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. *The Allegations of Mayes's Complaint*

As noted, Mayes's complaint alleges that La Sierra was negligent in causing her injuries for multiple reasons. First, La Sierra's field did not have protective netting over its dugouts, in order to protect spectators from batted and foul balls and broken bats. Other colleges, including Marymount, had protective netting "all along and including over the dugout on the first- and third-base lines." La Sierra knew or reasonably should have known that the standard of care was to provide safety netting along the first- and third-base lines, up to, over, and past the dugout areas.

Second, La Sierra did not post signs or otherwise warn spectators that there was no protective netting over the dugouts. Protective netting or screening of spectator areas is so "ubiquitous" at baseball fields that Mayes did not realize that La Sierra's field lacked sufficient protective netting or screening.

Third, La Sierra did not provide a sufficient number of screened or protected seats for as many people as La Sierra reasonably should have expected would want them at the April 22, 2018 game—a playoff game with unusually high attendance. La Sierra provided two portable seating stands behind home plate, which were protected by the backstop fencing, but each portable stand only seated around 20 people. The portable stands were on rocky and uneven ground and swayed when walked on, creating a risk of injury to people who used them. La Sierra did not provide any other seating, including screened seating along the first-or third-base lines, which could have reduced the risk of being struck by a foul ball. Mayes was unable to place her folding chair behind home

3

plate due to the uneven ground, so she placed her chair along the third-base line, where there was no safety netting over the dugout.

Fourth, La Sierra failed to exercise crowd control, resulting in multiple distractions that increased the risk that Mayes would be injured. La Sierra allowed people to erect folding chairs, tents, and umbrellas along the third-base line, and to walk around the third-base line area, creating distractions and obstructing Mayes's view of the field and foul balls coming into the seating area.

La Sierra answered the complaint, generally denying its allegations and alleging as affirmative defenses that plaintiff's negligence claim was barred both by "assumption of risk" and Civil Code section 846.

B. *La Sierra's Motion for Summary Judgment*

La Sierra moved for summary judgment, claiming that Mayes's negligence cause of action was barred by both (1) the primary assumption of risk doctrine, and (2) the "recreational use" immunity statute, Civil Code section 846.[1] In support of its motion, La Sierra adduced deposition testimony of Mayes and La Sierra's athletics director. This evidence showed the following:

---

[1] The trial court rejected La Sierra's alternative claim that it was immune from liability for Mayes's injuries based on Civil Code section 846, which immunizes property owners from liability for injuries incurred on their property by persons who are using the property for a " 'recreational purpose.' " As the court pointed out, La Sierra did not provide any authority for the proposition that watching a baseball game at its campus was a " 'recreational purpose' " within the meaning of the statute. Because La Sierra does not reprise its Civil Code section 846 claim in this appeal, we deem the claim abandoned. (*Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1261.)

4

La Sierra did not sell tickets or charge admission to the April 22, 2018 game and did not tell spectators where they could sit at its games. Mayes chose her seat, in an unscreened area along the third-base line, where she could see her son who was pitching for Marymount, but she could not see the batters. Until she was struck by the foul ball, Mayes did not feel unsafe in her seat.

Before the April 22, 2018 game, Mayes had attended 300 to 400 baseball games in which her two sons had played. Mayes was generally familiar with baseball and had seen balls hit into the stands. She did not need a posted sign to advise her that batted balls could go into the stands.

According to La Sierra's athletic director, since 2009 there had been no reported incidents of a spectator being injured by a foul ball at La Sierra's field, other than Mayes's incident. At the April 22, 2018 game that Mayes attended, there were portable bleachers for seating, and spectators were free to set up their own seating "wherever they chose." La Sierra did not ask any of the spectators to take their tents or umbrellas down or to sit behind the backstop behind home plate. La Sierra's practice was "to assist with crowd control" only when an umpire asked, and the umpire at the April 22, 2018 game did not ask La Sierra to assist with crowd control. There was "no requirement" for a California Pacific Conference institution, or an NAIA (National Association of Intercollegiate Athletics) institution, such as La Sierra, to "put netting by the dugouts" of their baseball fields. It is a "normal occurrence" for balls to be batted outside the field of play and into the spectator seating areas.

C. *Mayes's Opposition*

In her opposition, Mayes adduced her own declaration and the declaration of Gil Fried, an expert in "ballpark safety and management," including "foul ball safety." Mayes adduced additional excerpts of her deposition testimony and the deposition testimony of La Sierra's athletic director.

### 1. Mayes's Additional Statements

Mayes drove to the April 22, 2018 playoff game with her husband. Marymount had advertised the game, and Mayes had been told that the families of the teams were welcome to watch the game. La Sierra permitted Mayes and her husband to enter La Sierra's campus through a guarded gate and park in a lot designated for the public. Mayes first looked for seats behind home plate, but there was only one seat available on one of the unstable portable bleachers, and the bleachers were on a hilly, rocky, and dirt-covered area. The dirt was blowing around and making it "potentially dangerous" to sit in that area.

Mayes and her husband placed their folding chairs in the grassy area along the third-base line, where hundreds of other spectators had placed their chairs, tents, and umbrellas. There was no crowd control; no La Sierra personnel were present to control the hundreds of spectators or tell them where to sit. There were also no posted signs, advising people that they may ask La Sierra's athletic director or the umpire to assist in crowd control. La Sierra allowed hundreds of spectators to walk around and to erect tents and umbrellas, generally causing distractions and blocking Mayes's view of the game.

6

The above-ground dugout also blocked Mayes's view of the batters. The distance from Mayes's chair to the playing field was approximately 60 feet.

Mayes was not concerned for her safety because every baseball field in which she had been over the previous 15 years had had protective netting over the dugouts and, for that reason, Mayes believed that La Sierra's field had the same protective netting. Mayes did not look for the protective netting but expected it to be there. She had never seen a spectator hit by a foul ball at any college baseball game because spectators were always protected by "netting and/or fencing." Marymount's home field had protective netting from home plate "all along and including over the dugout on both the first- and third-base lines." There were no posted signs at La Sierra's field, telling spectators that the only protected seats were behind home plate.

During the game, a batted ball "flew over the dugout" and struck Mayes in her face, causing her serious physical injury, including broken facial bones, cuts, eye damages, contusions, and brain damage. Mayes was unable to see the foul ball as it came toward her because the raised dugout blocked her view of the batter and people were "walking about causing distractions."

2. Gil Fried's Expert Declaration

Gil Fried, a college professor and an expert on "ballpark safety and management," has written articles and books about safety concerns at sports facilities, including, in the baseball context, "foul ball safety." Fried has qualified to testify as an expert in 10 "foul ball and hockey puck-related cases."

7

Fried opined that the flat, grassy area along the third-base line at La Sierra's field, where Mayes was sitting when she was struck by a foul ball, was too close to the playing field and "violate[d] the standards for a college baseball field." Fried averred that, "NCAA [(National Collegiate Athletics Association)] rules related [to] distances between the playing field and spectator stands apply here since the NAIA does not have any different rules for baseball fields. Pursuant to the NCAA standards, there must be 60 feet of unobstructed space between the foul line and the fence around the field. This 60-foot distance includes the distance to the dugout." La Sierra's field violated this 60-foot standard because the distance from the third-base dugout to the third-base line, based on Google Earth measurements, was 32 feet.

According to Fried, National Collegiate Athletics Association (NCAA) rules also "highlight" recommended distances for player and fan safety. "The closer a spectator is to the field, the less reaction time they have. This is especially critical here, where the dugout is constructed above grade and blocks the view of the field." Mayes was allowed to sit approximately 60 feet from the field. This distance was too close and unreasonably increased the danger to Mayes of being struck by a foul ball. It also increased the severity of the injury that a spectator was likely to suffer from being hit by a foul ball.

Fried further opined that raised dugouts and a lack of crowd control present additional dangers to spectators at baseball games. Raised dugouts, like La Sierra's, are dangerous because they block spectators' views of the field and prevent them from seeing foul balls as they enter the seating area. The lack of crowd control at La Sierra's field,

8

which allowed spectators to "walk around freely" and block Mayes's view of the field, created another dangerous condition.

The current standard of care required La Sierra to install protective netting "for the most dangerous parts" of La Sierra's field, including the areas above the eight-foot-high dugouts. This had been the standard of care in Major League Baseball (MLB) "since the 2019 season." Installing netting over La Sierra's dugouts would not "alter the game in any way" because no player is able to "jump that high and across the depth of the dugout to catch a ball." The costs of such netting would be "reasonably inexpensive," approximately $8,000 to $12,000 for 60 feet of netting. This "is cheap compared to the cost of medical services for just one injury," like the injury that Mayes suffered. Approximately 7.5 percent of foul ball injuries require hospitalization. "Recent improvements in net technology" allow teams to "install thinner screens that present less of an obstruction to fans' views of the field, while still providing more than suitable protection."

For all of these reasons, Fried opined that La Sierra's field was "dangerous and substandard for a college baseball field." Fried opined that "[o]ptions to make the ball field safer could include: (1) the dugouts should be below grade so spectators may see over them; (2) the spectators should be prevented from sitting where their view of the field is blocked; (3) La Sierra . . . should provide raised seating that allows spectators to see over the dugouts; (4) La Sierra should have extended the protective netting over the dugouts, especially since it knew that people were sitting in the flat grassy area behind the dugouts; (5) La Sierra should have done studies to identify the most dangerous parts

9

of the field and provide protection for them; (6) provide visible warnings to spectators as to where the dangerous areas of the [field] are located; (7) provide a trained crowd manager to eliminate distractions and other crowd-caused dangers; (8) purchase larger portable bleachers or install fixed [seating] behind the home plate screening so that there is a reasonable number of protected seats for the number of spectators [who] may request[] them; and (9) not allow spectators to sit too close to the playing field and within a recognized zone of danger."

D. *The Trial Court's Ruling*

In granting La Sierra's motion, the trial court described the case as a "textbook primary assumption of the risk case." The court adopted its tentative ruling, in which it stated: "There is no question that being struck by a foul ball is an inherent risk of watching a baseball game, and that primary assumption of the risk bars claims for injuries common to baseball. While there is generally no duty to protect plaintiff from risks inherent in a sport, or to eliminate all risk from a sport, there is a duty not to increase the risk of harm beyond what is inherent in the sport."

The trial court ruled that La Sierra did not increase the risk of harm to Mayes, beyond the risk inherent in watching a baseball game. La Sierra's facts were undisputed; it did not tell spectators, including Mayes, where to sit. Rather, Mayes chose where to sit, a place where she could watch her son pitch, "knowing that she could not see the batters." The court acknowledged Mayes's evidentiary showing that the standard of care required La Sierra to install protective netting over the most dangerous parts of its

10

ballpark, but wrote that Mayes offered "no evidence that she was sitting in one of the most dangerous parts of the ballpark."

The trial court distinguished *Summer J. v. United States Baseball Federation* (2020) 45 Cal.App.5th 261 (*Summer J.*) "on its facts" because, there, "the MLB teams voluntarily agreed to expand the protective netting, and the danger to spectators was increased by the addition of box seats on the first-and third-base lines that were closer to the field of play than recommended." Thus, the court concluded that "no evidence" showed that La Sierra increased the risk that Mayes would be struck by a foul ball.

### III.  DISCUSSION

A. *Standard of Review on Motion for Summary Judgment*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)  "A motion for summary judgment is properly granted only when 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., §437c, subd. (c).)" (*Soto v. Union Pacific Railroad Co.* (2020) 45 Cal.App.5th 168, 176.)

"A moving party defendant is entitled to summary judgment if it establishes a complete defense to the plaintiff's causes of action, or shows that one or more elements of each cause of action cannot be established.  The defendant must support its motion with affidavits, declarations, admissions, answers to interrogatories, depositions, and

11

matters of which judicial notice shall or may be taken." (*Laabs v. Southern California Edison Co.* (2009) 175 Cal.App.4th 1260, 1268.)

A defendant moving for summary judgment based upon an affirmative defense bears an " 'overall burden of persuasion' " that there is a complete defense to the plaintiff's action. (*Fazio v. Fairbanks Ranch Country Club* (2015) 233 Cal.App.4th 1053, 1057; *Grotheer v. Escape Adventures*, *Inc.* (2017) 14 Cal.App.5th 1283, 1293 (*Grotheer*) [" 'From commencement to conclusion, the moving party defendant bears the burden of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law.' "].)

To meet its overall burden of persuasion, the defendant must first make a prima facie evidentiary showing—a burden of producing evidence—that there is a complete defense to the plaintiff's action. (*Aguilar*, *supra*, 25 Cal.4th at p. 850; Code Civ. Proc., § 437c, subd. (p)(2).) The defendant meets its initial burden if it presents sufficient evidence to support a judgment in its favor on the challenged element or defense. (*Aguilar*, at p. 851.) If the defendant meets its initial burden, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of material fact on the challenged element or defense. (*Id*. at p. 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion, in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.)

We review the trial court's ruling on a summary judgment motion de novo, considering all of the evidence adduced on the motion (except evidence the trial court

12

properly excluded) and the uncontradicted inferences the evidence reasonably supports. (*Merrill v. Navegar*, *Inc.* (2001) 26 Cal.4th 465, 476.)  The trial court's stated reasons for granting summary judgment are not binding on us because we review the court's ruling, not its rationale.  (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

" 'Our review of the summary judgment motion requires that we apply the same three-step process required of the trial court.  [Citation.]  "First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading.  [Citations.]  [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor.  [Citations.] . . . [¶] . . . [T]he third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." ' "  (*Erikson v. Nunnink* (2011) 191 Cal.App.4th 826, 848.)

B. *The Primary Assumption of Risk Doctrine*

Generally, everyone has a duty of care not to cause an unreasonable risk of harm or injury to others.  (Civ. Code, § 1714, subd. (a).)  But some activities—including many sports and recreational activities—are inherently dangerous, and imposing a duty to eliminate or mitigate the risks inherent in these activities could alter their nature or inhibit vigorous participation in them.  (*Nalwa v. Cedar Fair*, *L.P.* (2012) 55 Cal.4th 1148, 1154-1156 (*Nalwa*).)  The primary assumption of risk doctrine is a rule of "limited duty" that avoids these adverse or chilling effects.  (*Id*. at p. 1154; *Kahn v. East Side Union*

13

*High School Dist.* (2003) 31 Cal.4th 990, 1003 (*Kahn*).) "The primary assumption of risk doctrine rests on a straightforward policy foundation: the need to avoid chilling vigorous participation in or sponsorship of recreational activities by imposing a tort duty to eliminate or reduce the risks of harm inherent in those activities. It operates on the premise that imposing such a legal duty 'would work a basic alteration—or cause abandonment' of the activity." (*Nalwa*, at p. 1156.)

Whether and to what extent a defendant has a duty of care in a particular context depends not only on the nature of the sport or recreational activity in question, but also on the " 'role of the defendant whose conduct is at issue in a given case.' " (*Kahn*, *supra*, 31 Cal.4th at p. 1004, quoting *Knight v. Jewett* (1992) 3 Cal.4th 296, 318 (*Knight*).) "In the sport of baseball, for example, although the batter would not have a duty to avoid carelessly throwing the bat after getting a hit—vigorous deployment of a bat in the course of a game being an integral part of the sport—a stadium owner, because of his or her different relationship to the sport, may have a duty to take reasonable measures to protect spectators from carelessly thrown bats. For the stadium owner, reasonable steps may minimize the risk without altering the nature of the sport." (*Kahn*, at p. 1004, citing *Knight*, at p. 317; *Ratcliff v. San Diego Baseball Club* (1938) 27 Cal.App.2d 733, 736.)

In any case in which the primary assumption of risk doctrine applies, operators, instructors, and participants in the activity owe other participants a duty "not to act so as to *increase* the risk of injury over that inherent in the activity." (*Nalwa*, *supra*, 55 Cal.App.4th at p. 1154.) But owners and operators of sports venues and other recreational activities have an *additional duty* to undertake reasonable steps or measures

14

to protect their customers' or spectators' safety—if they can do so without altering the nature of the sport or the activity. (See *Knight*, *supra*, 3 Cal.4th at pp. 317-318.)

As *Grotheer* explained, "[s]afety is important, but so is the freedom to engage in recreation and challenge one's limits. The primary assumption of risk doctrine balances these competing concerns by absolving operators of activities with inherent risks from an obligation to protect their customers from those risks. [¶] What the primary assumption of risk doctrine does not do, however, is absolve operators of *any obligation* to protect the safety of their customers. (*Knight*, *supra*, 3 Cal.4th at pp. 317- 318.) As a general rule, where an operator can take a measure that would increase safety and minimize the risks of the activity *without also altering the nature of the activity*, the operator is required to do so." (*Grotheer*, *supra*, 14 Cal.App.5th at pp. 1299-1300.)

Indeed, "[t]he primary assumption of risk doctrine has never relieved an operator of its duty to take reasonable steps to minimize inherent risks without altering the nature of the activity." (*Grotheer*, *supra*, 14 Cal.App.5th at pp. 1300-1301, citing *Morgan v. Fuji Country USA*, *Inc.* (1995) 34 Cal.App.4th 127, 133-134 [golf course owner and operator had duty to design golf course to minimize risk that player would be hit by a golf ball]; *Saffro v. Elite Racing*, *Inc.* (2002) 98 Cal.App.4th 173, 179 [marathon organizer had duty to provide "adequate water and electrolyte fluids along the 26-mile course" to minimize risks that runners would suffer dehydration and hyponatremia]; and *Rosencrans v. Dover Images*, *Ltd.* (2011) 192 Cal.App.4th 1072, 1083-1084 [motocross track operator had duty to provide signaling system for warning riders when a rider fell on the track to minimize risks of collisions between riders].)

C. *The* Summer J. *Decision and the "Baseball Rule"*

    1. The *Summer J.* Decision

*Summer J.*, *supra*, 45 Cal.App.5th 261, was decided in February 2020, after La Sierra filed its motion and before Mayes filed her opposition. Mayes relied on *Summer J.* in her opposition, but the trial court distinguished the case "on its facts." As we explain, there are some factual dissimilarities between *Summer J.* and this case, but *Summer J.* helps to illustrate why Mayes raised triable issues of material fact concerning the legal question of whether La Sierra had a duty to install protective netting above, and perhaps beyond, the above-ground dugouts at its field, in order to protect spectators from foul balls.

In August 2013, twelve-year-old Summer J. was seriously injured when she was struck in the face by a line drive foul ball, while attending a professional baseball game, sponsored by the United States Baseball Federation (US Baseball), at Blair Field on the campus of California State University, Long Beach (CSULB). (*Summer J.*, *supra*, 45 Cal.App.5th at p. 266.) When she was injured, Summer J. was sitting in a box seat at field level, along the first-base line. (*Ibid.*) This was not a college game, or, as here, a playoff game between two NAIA teams. Rather, it was a professional team trial game. U.S. Baseball was holding its national team trials at Blair Field, a baseball venue jointly owned and maintained by CSULB and the City of Long Beach. (*Ibid.*) Summer J. sued US Baseball, CSULB, and the City of Long Beach for negligence and premises liability. (*Ibid.*)

16

As to US Baseball, Summer J. alleged that US Baseball sponsored the game and controlled Blair Field on the day she was injured; "inadequate protective netting was provided for spectators at Blair Field 'in the perceived zone of danger behind home plate' "; and "[t]he presence of some limited netting at the stadium gave Summer a false sense of security that watching the game in a seat beyond this protected area would be safe." (*Summer J.*, *supra*, 45 Cal.App.5th at p. 267.) Summer J. also alleged that U.S. baseball was aware of the inadequate nature of the netting, yet failed to provide any warnings to spectators about the danger of being struck by a batted ball. (*Ibid*.)

The trial court sustained US Baseball's demurer to Summer J.'s first amended complaint without leave to amend, and the *Summer J.* court reversed. (*Summer J.*, *supra*, 45 Cal.App.5th at pp. 266-267.) In her proposed second amended complaint, Summer J. alleged that Blair Field also had inadequate protective netting "for field-level seating along the first- and third-base lines between home plate and the dugouts." (*Id*. at p. 272.) She also proposed to allege that "the danger to spectators of being hit by hard-hit foul balls in the high-risk, unscreened area at Blair Field had been increased by [(1) the] addition of box seats on the field level along the first- and third-base lines that were closer to the field of play than the distance recommended *for college baseball* stadiums by the [NCAA,] and [(2) the] creation of unnecessary distractions at the ballpark including large, colorful advertising on the outfield wall and Wi-Fi ready access to encourage spectators to use their mobile devices during ball games." (*Ibid*.)

The trial court in *Summer J.* ruled that Summer J.'s allegations, as stated in her first amended and proposed second amended complaints, were insufficient to state a

17

cause of action for negligence or premises liability because "being hit by a foul ball is an inherent risk to spectators attending baseball games." (*Summer J.*, *supra*, 45 Cal.App.5th at p. 272.) On appeal, US Baseball echoed the trial court's ruling, arguing that its duty to Summer J., as the sponsor of the game, was limited to a duty not to increase the risks of harm inherent in Summer J.'s attendance at the game. (*Id.* at pp. 272-273.)

*Summer J.* described the trial court's description of US Baseball's duty to Summer J. as "cramped" or incomplete, and as "fundamentally misperceive[ing]" the scope of US Baseball's duty: "[A]s the entity responsible for operating Blair Field . . ., US Baseball had a duty not only to use due care not to increase the risks to spectators inherent in the game but *also to take reasonable measures that would increase safety and minimize those risks without altering the nature of the game*." (*Summer J.*, *supra*, 45 Cal.App.5th at p. 273, italics added.) The court concluded that, "Installing protective netting down the first- and third-base lines at least to the dugouts would certainly increase safety and minimize risk to fans sitting in those areas." (*Ibid*.) As to whether the installation of such protective netting would alter the nature of baseball, the court concluded it would not, in part because MLB's commissioner had announced at MLB's 2019 winter meetings that "all 30 major league teams will expand the protective netting in their stadiums 'substantially beyond the end of the dugout' for the 2020 season and that seven or eight stadiums will run netting all the way to the foul poles." (*Id.* at pp. 266, 274.) The court also relied on a 2018 law review article, Grow & Flagel, *The Faulty Law and Economics of the "Baseball Rule"* (2018) 60 Wm. & Mary L. Rev. 59, 85-98, which discussed recent developments that had increased the risk that professional baseball game

spectators will be struck by foul balls. These included changes in stadium construction that bring spectators closer to the field, the elevated velocity of pitched balls, and increased distractions at games, including free Wi-Fi. (*Summer J.*, at p. 274.)

The *Summer J.* court concluded that Summer J.'s existing and proposed allegations "adequately identified an enforceable duty, at least for pleading purposes," by "incorporating the views of experienced baseball professionals that extending protective netting along the first- and third-base lines will minimize the inherent risk of being injured by a foul ball without fundamentally changing the game." (*Summer J.*, *supra*, 45 Cal.App.5th at p. 274.) The court thus rejected US Baseball's and the trial court's reliance on the "baseball rule." (*Ibid*.) Under the baseball rule, for over a century, courts throughout the United States " 'have consistently held that professional baseball teams [and stadium owners] are not liable for injuries sustained by fans hit by bats or balls leaving the field of play, so long as the teams [and owners] have taken minimal precautions to protect their spectators from harm.' " (*Id.* at p. 265, fn. 2.)

2. The Baseball Rule

In California, the baseball rule was applied in *Quinn v. Recreational Park Asso.* (1935) 3 Cal.2d. 725 (*Quinn*). The plaintiff, 14-year-old Joan Quinn, was struck by a foul ball while seated in an unscreened seat, near the first-base line, while watching a professional baseball game. (*Id*. at pp. 727-728.) When she purchased her ticket, Quinn asked for a screened seat near the first-base line, but when she went into the grand stand she found that all of the screened seats near the first-base line were taken, so she sat in an unscreened seat. (*Id*. at p. 730.) The usher asked her to temporarily sit in the unscreened

19

seat until he could "see what could be done about it." (*Ibid*.) Screened seats were available behind home plate, but Quinn chose not to take one of those screened seats because she wanted to see the game from along the first-base line, knowing "she would be in danger of being struck by a batted ball." (*Id*. at pp. 730-731.)

In affirming a directed verdict in favor of the team owner, the *Quinn* court relied on the baseball rule: "[I]t has been generally held that one of the natural risks assumed by spectators attending professional games is that of being struck by batted or thrown balls; that the management is not required, nor does it undertake to insure patrons against injury from such source. All that is required is the exercise of ordinary care to protect patrons against such injuries [citations], and in doing so the management is not obliged to screen all seats, because . . . many patrons prefer to sit where their view is not obscured by a screen. Moreover, the management is not required to provide screened seats for all who may apply for them. The duty imposed by law is performed when screened seats are provided for as many as may be reasonably expected to call for them on any ordinary occasion [citations]; and if . . . a spectator chooses to occupy an unscreened seat . . . [or is] unable to secure a screened seat and consequently occupies one that is not protected, he assumes the risk of being struck by thrown or batted balls . . . ." (*Quinn*, *supra*, 3 Cal.2d at p. 729.) Thus, the *Quinn* court concluded that the plaintiff Quinn assumed the risk of her injury by sitting in the unscreened seat, with "full knowledge" of the danger of being hit by a batted ball. (*Quinn*, *supra*, 3 Cal.2d at p. 731.)

In *Neinstein v. Los Angeles Dodgers*, *Inc.* (1986) 185 Cal.App.3d 176 (*Neinstein*), the court followed *Quinn* in upholding a summary judgment in favor of a stadium owner

against a spectator who was injured by a foul ball while sitting in an unscreened seat along the first-base line. (*Id*. at pp. 179-181.) *Neinstein* held that stadium owners have no "duty to protect spectators from the natural hazards generated by the way in which the game itself is played." (*Id*. at p. 181.) The court reasoned that permitting the plaintiff to recover from the stadium owner under the circumstances presented would force all professional baseball stadium owners to do one of two things: (1) place all spectators behind a protective screen; or (2) raise the price of tickets to cover the costs of compensating all spectators who are injured by batted balls. (*Ibid*.) The court found neither alternative acceptable and noted that imposing a duty on stadium owners to seat all spectators behind protective screens would both (1) reduce the quality of everyone's view of the field, and (2) change the nature of the game by disabling players from reaching into the spectator areas to catch foul balls. (*Ibid*.)

A more recent case, *Lowe v. California League of Prof. Baseball* (1997) 56 Cal.App.4th 112 (*Lowe*), illustrates that distractions, which are extraneous to the game of baseball, are not risks inherent in attending a baseball game. The plaintiff in *Lowe* was injured by a foul ball when he was momentarily distracted from watching the playing field by the antics of a costumed team mascot, a dinosaur character, who was entertaining the crowd behind the plaintiff and touching the plaintiff with the dinosaur costume's tail. (*Id*. at p. 114.) *Lowe* held there was a triable issue of fact as to whether the mascot's antics increased the risk that the plaintiff would be struck by a foul ball. (*Id*. at p. 123.) Although the court recognized that foul balls are an inherent risk to spectators, the

21

mascot's antics, the court reasoned, were "not an essential or integral part of the playing of a baseball game." (*Ibid*.)

A variation of the baseball rule has been applied to shield professional hockey team owners and hockey stadium operators from a duty to mitigate the risks that hockey game spectators will be struck by flying hockey pucks. The plaintiff in *Nemarnik v. Los Angeles Kings Hockey Club* (2002) 103 Cal.App.4th 631 (*Nemarnik*), a spectator at a hockey game, was injured when a puck "flew off the ice" and struck her in her face. (*Id.* at pp. 634-635.) There was no crowd control, and the plaintiff's view of the ice was obstructed by a large crowd of people congregating in her area. (*Id.* at p. 635.)

The plaintiff sued the owner of the team and the operator of the hockey rink, claiming they were negligent in allowing a large crowd to form and to remain in her assigned seating area, where they were not supposed to be, which increased the "normal risk" that a spectator would be hit by a puck at a hockey game. (*Nemarnik*, *supra*, 103 Cal.App.4th at p. 634.) The plaintiff did not claim the defendants had a duty to keep pucks from flying into the spectator stands or to keep " 'every single spectator perfectly seated at all times.' " (*Id.* at pp. 638-639.) Rather, she claimed the defendants had a duty to ensure that large crowds do not form, blocking spectators' views of the ice, so that spectators could  see a puck coming and take evasive action. (*Id.* at pp. 634-635, 638.)

The *Nemarnik* court affirmed the judgment for nonsuit against the plaintiff, based on the primary assumption of the risk doctrine. (*Nemarnik*, *supra*, 103 Cal.App.4th at pp. 634, 641.) Following *Quinn* and *Neinstein*, the court framed the issue as whether the defendants had a duty to "eliminate the risk of injuries from flying pucks," not whether

the defendants had a duty to "provide better crowd control" or otherwise minimize the risk of injury from flying pucks. (*Id*. at p. 640.) Relying on *Neinstein*, the court reasoned: "[I]f we were to impose a duty upon defendants to eliminate all risk of injury from flying pucks, we would force defendants to do either of two things: provide a floor to ceiling protective screen around the rink, thereby reducing the quality of everyone's view; or increase the price of tickets to cover the increased liability costs. Like the court in *Neinstein*, we find neither alternative to be acceptable." (*Id*. at p. 641.) The court also distinguished *Lowe* on the ground that none of the employees of the hockey team or the hockey rink had "distracted or caused plaintiff to turn away from the ice." (*Id*. at p. 642.)

D. *La Sierra's Motion for Summary Judgment Was Erroneously Granted*

Mayes claims that her negligence cause of action is not barred by the primary assumption of risk doctrine, and that the trial court erroneously granted La Sierra's motion for summary judgment on this ground. We agree.

As discussed, the primary assumption of risk doctrine is a rule of limited duty that holds owners and operators of sports venues responsible for (1) not increasing the risks of injury inherent in the activity, and (2) taking reasonable steps to increase safety and minimize the inherent risks of injury, if such steps can be taken without altering the nature of the activity. (*Nalwa*, *supra*, 55 Cal.4th at p. 1154; *Grotheer*, *supra*, 14 Cal.App.5th at pp. 1300-1301.)

In granting La Sierra's motion, the trial court did not consider the second facet of La Sierra's limited duty—its duty to take reasonable steps to increase safety and minimize the risk of injury to spectators at its baseball games, if it could do so without

23

changing the nature of the game or the activity of watching the game. Rather, the trial court ruled that "primary assumption of the risk bars [all] claims for injuries common to baseball." Thus, like the trial court in *Summer J.*, the trial court here relied on a "cramped" or oversimplified interpretation of the primary assumption of risk doctrine, and the scope of a sports venue operator's limited duty to spectators. (*Summer J.*, *supra*, 45 Cal.App.5th at p. 273).

The trial court also relied on the baseball rule (*Quinn*, *supra*, 3 Cal.2d at p. 729) in granting La Sierra's motion. But the baseball rule, which holds that spectators assume the risk of injury from foul balls if they chose to sit in unscreened seats, even if no screened seats are available (*Quinn*, at pp. 729-730), is out of step with California's primary assumption of risk doctrine. (*Grotheer*, *supra*, 14 Cal.App.5th at pp. 1300-1301.) That is, the baseball rule does not account for the duties of owners and operators of sports venues to take reasonable steps to minimize the inherent risks of injury to their customers or spectators, if such steps can be taken without changing the nature of the sport or the activity. (*Knight*, *supra*, 3 Cal.4th at p. 317.)

In moving for summary judgment, La Sierra relied on the baseball rule and an oversimplified interpretation of the primary assumption of risk doctrine. That is, La Sierra did not attempt to show that there were no reasonable steps it could have taken to minimize the risk that spectators at its games would be injured by foul balls, because, for example, no such steps were reasonable, or no such steps could have been taken without changing the nature of the game or adversely affecting spectators' enjoyment of the game. Thus, La Sierra did not meet its initial burden of showing it was entitled to

24

summary judgment based on its affirmative defense of primary assumption of risk. (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

La Sierra also did not meet its overall burden of persuasion. (*Aguilar*, *supra*, 25 Cal.4th at pp. 850-851.) Mayes showed there were triable issues of fact concerning the scope of La Sierra's duty of care to spectators at its baseball games, and whether La Sierra breached its duty of care to Mayes. All of the evidence adduced on the motion showed there are triable issues of fact concerning whether La Sierra had a duty of care, or breached its duty of care, in failing to (1) install protective netting over and beyond its dugouts; (2) warn spectators that there was no protective netting over its dugouts; (3) provide a greater number of screened seats at its April 22, 2018 game, or at its playoff games, and (4) exercise crowd control, in order to remove distractions and reduce the risk that spectators who sat in the unscreened areas along the first- and third- base lines would be hit by balls leaving the field of play. Reasonable jurors could reach differing conclusions on these duty and breach-of-duty questions.[2]

---

[2] The existence and scope of legal duty of care is a question of law for the court to resolve, not based on the facts of the particular case but " 'on a more general basis suitable to the formation of a legal rule' to be applied in a broad category of cases." (*Grotheer*, *supra*, 14 Cal.App.5th at p. 1301; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 773 ["[T]he legal decision that an exception to Civil Code section 1714 is warranted, so that the defendant *owed no duty* to the plaintiff, or owed only a limited duty, is to be made on a more general basis suitable to the formulation of a legal rule, in most cases preserving for the jury the fact-specific question of whether or not the defendant acted reasonably under the circumstances."].)

Still, there may be triable issues of fact for a jury to determine concerning the question of duty in a particular case. " 'In conducting its [duty] analysis, the court may take into account factors . . . such as the overall social impact of imposing a significant precautionary obligation on a class of actors. These cases are properly decided as duty or

*[footnote continued on next page]*

1.  The Duty To Install Protective Netting

On the principle question of whether La Sierra had a duty to install protective netting over and perhaps beyond its dugouts, La Sierra's athletic director averred that there was "no requirement" for a California Pacific Conference or NAIA institution, like La Sierra, to "put netting by the dugouts" of their baseball fields. In response, Gil Fried, Mayes's expert witness on "ball park safety and management" and "foul ball safety," averred that the standard of care required La Sierra to install protective netting "for the most dangerous parts" of its field, including the areas above its eight-foot-high dugouts.[3]

---

no-duty cases. [But] [w]hen no such categorical considerations apply and reasonable minds could differ about the competing risks and burdens or the foreseeability of the risks in a specific case . . . courts should not use duty and no-duty determinations to substitute their evaluation for that of the factfinder.' " (*Cabral v. Ralphs Grocery Co.*, *supra*, 51 Cal.4th at p. 773, fn. 3.)

Further, whether the defendant acted reasonably under the circumstances (whether the defendant was negligent or breached its duty of care to the plaintiff), and if so whether the defendant's negligence was a legal cause of the plaintiff's injury, are factual questions for the jury to resolve unless, "under undisputed facts, there is no room for a reasonable difference of opinion." (*Nichols v. Keller* (1993) 15 Cal.App.4th 1672, 1687 ["If the circumstances permit a reasonable doubt" whether the defendant's conduct violated the standard of care or legally caused the plaintiff's injury, "the doubt must be resolved by the jury as an issue of fact rather than of law by the court"].)

Whether the defendant was negligent or breached its duty of care to the plaintiff is often a fact-specific question that asks whether the defendant "acted reasonably under the circumstances." (See *Cabral v. Ralphs Grocery Co.*, *supra*, 51 Cal.4th at p. 773.) In determining whether the defendant's conduct was reasonable under the circumstance, the jury may consider "the likelihood or foreseeability of injury" to the plaintiff, and foreseeability may also "be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 573, fn. 6.)

[3] Based on Fried's expert declaration, and the evidence that Mayes was sitting in an unscreened area along the third-base line, approximately 60 feet from the playing field, we disagree with the trial court's statement that Mayes "offer[ed] no evidence that

*[footnote continued on next page]*

Fried opined that the area in which Mayes was sitting—approximately 60 feet from the playing field—was too close to the field and "violate[d] standards for a college baseball field." According to Fried, NCAA rules relating to distances between the playing field and spectator stands applied to NAIA schools, like La Sierra, because the NAIA did not have different rules than the NCAA.

La Sierra did not dispute Fried's testimony that installing netting above La Sierra's dugouts would be "reasonably inexpensive"—approximately $8,000 to $12,000—for 60 feet of netting, or that installing such netting would not "alter the game in any way" because no player could jump across the depth of an eight-foot-high dugout to catch a ball. Nor did La Sierra dispute Fried's statement that "recent improvements in net technology" allowed teams to "install thinner screens that present less of an obstruction to fans' views of the field . . . ."

All of this evidence presents a triable issue whether it was reasonable to require La Sierra to install protective netting over and perhaps beyond the end of its dugouts, in order to minimize the risk of injury to spectators from batted or foul balls. A trier of fact could reasonably conclude that installing such protective netting is a reasonable means of reducing the risk that spectators will be struck by batted or foul balls, and that such protective netting would not alter the way the game is played or unreasonably interfere with spectators' views and enjoyment of the game. But a trier of fact could also

_____

she was sitting in one of the most dangerous parts of the ballpark." Indeed, Mayes offered ample evidence that the unscreened area along the third-base line, where she was sitting when the foul ball hit her, was a dangerous part of the ball park, if not "the most" dangerous part.

27

reasonably conclude that installing such protective netting would have been too expensive or was otherwise unwarranted for an NAIA or smaller college like La Sierra. A trier of fact will have to weigh and consider the evidence on both sides of the reasonableness question, and based on those factual findings, a court will ultimately have to determine whether La Sierra had a legal duty to install such protective netting.

2. The Duty To Warn of No Protective Netting

Mayes also raised a triable issue of fact concerning the legal question of whether La Sierra had a duty to warn spectators that there was no protective netting above its dugouts. Mayes had attended 300 to 400 baseball games in which her two sons had played. Mayes had come to expect all college baseball fields to have protective netting over the dugouts because at every college game she had attended, the spectators were protected by "netting and/or fencing." Marymount's home field had protective netting from home plate "all along and including over the dugout on both the first-and third-base lines." But there were no posted signs at La Sierra's field, telling spectators that the only protected seats were behind home plate.

Thus, a trier of fact could reasonably conclude that it was reasonable to require La Sierra to post signs or otherwise warn spectators that there was no protective netting over its dugouts and that the only protected seats were behind home plate. A trier of fact could conclude that such posted signs or warnings would not alter the game or inhibit spectators' enjoyment of the game and could reduce the risk that spectators will be struck by foul or batted balls. On the other hand, a trier of fact could conclude that such posted signs or warnings were unwarranted at La Sierra's field, because it was obvious to

28

anyone who attended a game at La Sierra's field that there was no protective netting over the dugouts, and that the only protected seating was behind home plate.

### 3. The Duty To Provide Additional Screened Seats

Mayes also raised a triable issue on the question of whether it was reasonable to require La Sierra to provide additional screened seating at the April 22, 2018 game, given that the game was a playoff game and was expected to attract more attendees than the number who normally attended La Sierra's regular season games. According to La Sierra's athletic director, Mayes's incident was the only reported incident of a spectator being hit by a foul ball at La Sierra's field since 2009. But at the April 22, 2018 playoff game, there were only two portable bleachers, each capable of seating around 20 people, located behind home plate and protective fencing. There was no other protected seating, even though "hundreds of spectators" were present, and people had erected tents and umbrellas, and were walking around, in the unprotected areas. Thus, a trier of fact could reasonably conclude that, by failing to provide additional screened or protected seating at the April 22, 2018 game, La Sierra failed to take a reasonable step to mitigate the risk that a spectator would be struck by a batted or foul ball. But a trier of fact could also reasonably conclude that additional screened seating was unwarranted for this playoff game, given that no spectator had been struck by a foul ball at La Sierra's field since 2009.

### 4. The Duty To Provide Crowd Control

Mayes also raised a triable issue as to whether it was reasonable to require La Sierra to provide crowd control at the April 22, 2018 game, in order to reduce

29

distractions that diverted spectators' attention from the playing field and their ability to see foul balls and take evasive action before they were struck by them. According to Mayes, there were people "walk[ing] around freely" in the area where Mayes was sitting, and people had also erected tents and umbrellas in the area. The tents, umbrellas, and nonstationary people were generally causing distractions and blocking Mayes's view of the playing field. La Sierra's athletic director admitted that La Sierra's practice was to not provide crowd control unless an umpire asked for it. But Fried opined that the lack of crowd control at the April 22, 2018 game created a dangerous condition, in addition to the lack of netting above the dugouts. Thus, a trier of fact could reasonably conclude that La Sierra should have provided crowd control, or that such crowd control would have been infeasible and unlikely to reduce the risk of injury to spectators from foul balls.

5. La Sierra's Arguments

La Sierra argues that *Neinstein*, *Lowe*, *and Nemarnik* "govern" the resolution of this appeal. We disagree. As discussed, *Neinstein* applied the baseball rule to bar a spectator's suit for injuries the spectator sustained when struck by a foul ball while sitting along the unscreened first base-line area at a professional baseball game. (*Neinstein*, *supra*, 185 Cal.App.3d at pp. 179, 181.) But, like the baseball rule itself, *Neinstein* is out of step with the primary assumption of risk doctrine. *Neinstein* was decided before *Knight*, *supra*, 3 Cal.4th 296, and did not account for the duty of baseball stadium owners and operators to take reasonable steps to increase the safety of spectators, if such steps can be taken without changing the nature of the game or spectators' enjoyment of the game. (*Neinstein*, at p. 181.)

30

La Sierra relies on *Lowe* and *Nemarnik* because they affirmed the baseball rule as articulated in *Neinstein* (*Lowe*, *supra*, 56 Cal.App.4th at p. 124; *Nemarnik*, *supra*, 103 Cal.App.4th at p. 640), although *Lowe* distinguished *Neinstein* in finding a triable issue of fact as to whether the team mascot's distractions increased the risk to the plaintiff of being struck by a foul ball (*Lowe*, at p. 123).  But, like *Neinstein*, *Lowe* and *Nemarnik* are inapposite because they did not address the duties of sports venue owners and operators to take reasonable steps to mitigate the risks of injuries to spectators.

La Sierra also argues that *Summer J.*, *supra*, 45 Cal.App.5th 261 is inapposite because:  (1) La Sierra is not "a commercial operator of a stadium or arena" or "anything like" the defendant, U.S. Baseball, in *Summer J.*; and (2) La Sierra did not charge fees to park or watch games "at its most humble ball field."  La Sierra notes that "[t]he factual basis for *Summer* [*J.*] is founded on the goal of filling a stadium or arena with 'customers,' ones who pay for the privilege to view the sport (or event)."

To be sure, La Sierra did not sell tickets to its games, and La Sierra's field was neither designed nor intended for large, commercial sporting events.  But these factors do not preclude the conclusion that it is reasonable to impose a duty on La Sierra to place netting over its dugouts, or beyond its dugouts, and thereby offer additional screened seating to spectators—at least at games that are reasonably expected to attract more people than can be seated on the portable bleachers behind home plate—the only protected area of La Sierra's field.

Indeed, although Mayes chose her own, unscreened seat along the third-base line, she arguably did not have a reasonable alternative, given that there was only one open

seat in the bleachers, she needed two seats because she was attending the game with her husband, and the bleachers were unstable. The factual distinctions between this case and *Summer J.* also do not preclude imposing a duty on La Sierra to warn spectators that there was no netting above the dugouts, and a further duty to exercise crowd control in order to minimize the risk that a spectator will be struck by a batted ball. La Sierra's attempt to distinguish *Summer J.* helps illustrate that this case presents triable issues concerning the four principal questions of duty alleged in Mayes's complaint.

As La Sierra also points out, the " 'open and obvious' " conditions at La Sierra's field *might* constitute a complete defense to Mayes's negligence claim. But this, too, is not a question that can be resolved on La Sierra's motion. (See *Summer J.*, *supra*, 45 Cal.App.5th at pp. 274-275 ["[W]hether the danger of injury from foul balls in unprotected seating was sufficiently obvious to relieve US baseball of its duty to warn Summer of its existence is, at most, a question of fact. . . ."].) Mayes averred that she expected there to be netting over La Sierra's dugouts, and that she did not look to see whether there was such netting, because every baseball field she had been to over the previous 15 years had protective netting over its dugouts. In sum, whether La Sierra owed any duties of care to spectators at its field in the respects alleged in Mayes's complaint and, if so, the scope of La Sierra's duties, present questions of fact that cannot be resolved, as a matter of law, based on the evidence presented in support of and in opposition to La Sierra's motion.

## IV.  DISPOSITION

The judgment is reversed.  Mayes shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278.)  The matter is remanded to the trial court with directions to enter an order denying La Sierra's motion for summary judgment on Mayes's complaint.

CERTIFIED FOR PUBLICATION

FIELDS
J.

We concur:


MILLER
Acting P.J.


MENETREZ
J.

33