Filed 2/7/22  W.R. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| W.R., | |
| Petitioner, | E077934 |
| v. | (Super.Ct.No. J280519) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Steven A. Mapes.

Petition denied.

James W. Tritt for Petitioner.

No appearance for Respondent.

1

Steven O'Neill, Interim County Counsel, and Kaleigh Ragon, Deputy County

Counsel, for Real Party in Interest.

I

INTRODUCTION

Petitioner W.R. (Father) seeks extraordinary writ relief (Welf. & Inst. Code,

§ 366.26,[1] subd. (*l*); Cal. Rules of Court, rule 8.452) from the juvenile court's order made

at a section 366.3 permanency planning review hearing terminating Father's reunification

services, denying return of his now two-year-old son L.O to his care, and setting a

selection and implementation hearing (§ 366.26).[2]  He contends substantial evidence does

not support the juvenile court's finding that the return of his child to his custody would

create a substantial risk of detriment to L.O.'s physical or emotional well-being.  He

further argues the juvenile court erred in ruling out the paternal grandmother (PGM) for

placement.  We do not find Father's contentions meritorious, and we accordingly deny

the petition.

II

FACTUAL AND PROCEDURAL BACKGROUND

In March 2019, San Bernardino County Children and Family Services (CFS)

received a referral for general neglect of L.O. after then 15-year-old Mother, a San

Bernardino County dependent minor, was picked up in San Diego by a trafficking

---

[1]  All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]  K.O. (Mother) is not a party to this writ proceeding.

2

officer.[3]  Mother had given birth to L.O. in San Diego and following her discharge from the hospital several days later, she was transported to San Bernardino County Juvenile Hall due to a warrant for not appearing in court.  L.O. remained in the hospital for seven days due to Group B Strep.  Mother was guarded and would not provide contact information for Father.  Mother had a history of substance abuse, defiance toward authority, human trafficking, running away from her group homes, and extensive trauma related to sexual abuse and exploitation.

CFS detained L.O. on April 4, 2019, and filed a petition on behalf of the child under section 300, subdivisions (b) (failure to protect), and (g) (no provision for support).  The petition was later amended, deleting the subdivision (g) allegation and adding subdivision (b) allegations and a subdivision (d) (sexual abuse) allegation against Father.

L.O. was formally detained from parental custody at the April 9, 2019 detention hearing.  At that hearing, Mother identified Father as L.O.'s father, giving his name and contact information.  The paternal stepgrandfather, the maternal grandmother, a maternal aunt, a maternal uncle, and the paternal great-grandmother were identified as possible placements for L.O.[4]

CFS's investigation revealed that then 21-year-old Father had been in a relationship with Mother for the past three years.  The relationship began when Mother

---

[3]  Because Mother is not a party to this writ proceeding, we discuss matters related to Mother as relevant for this writ proceeding.

[4]  The paternal great-grandmother later indicated that she would not be able to care for the child due to her age and part-time work.  In September 2019, the maternal aunt declined placement of L.O. due to health issues.

3

was 13 years old, and Father was 18 years old. In June 2017, Father was arrested for domestic violence against Mother and statutory rape. He was eventually convicted of these charges and placed on probation. Father had about a year and a half left on probation. Father noted that he was not a sex offender as a result of his conviction but was only allowed to be around children who were family members. However, after his incarceration, he continued to maintain a relationship with Mother and received a probation violation as a result. Father stated that his probation officer did not know about L.O. and that he was afraid to notify him as it would likely result in another violation.

Father appeared at an April 30, 2019 hearing and denied the allegations. The juvenile court referred the matter to mediation and provided Father with visitation.

On June 6, 2019, a referral was called into the child abuse hotline alleging that Father, then age 21, sexually victimized Mother, then age 15. The reporting party stated that on June 3, 2019, Father's girlfriend, C.A., found recent text messages in his phone indicating that Father had picked up Mother from school and engaged in sexual intercourse with Mother in a parking lot. Father became upset when confronted with this information by C.A. and wrestled the phone away from C.A. C.A. contacted law enforcement and Father was arrested for domestic violence. On June 5, 2019, Father was arrested again for violating probation by having ongoing contact with Mother.

Father was released from custody in September 2019. Mother ran away from her group home and was believed to be staying with Father. On September 19, 2019, CFS contacted San Diego law enforcement to request a welfare check at Father's home. The

4

welfare check revealed that Father had been living in the home until approximately a week prior when his family kicked him out of the home. Father's family also informed the officers that Father was with Mother and provided a description of Father's car. Father appeared to be transporting Mother to and from her scheduled visitations with L.O. While Mother visited with L.O., Father was observed waiting outside the CFS building near the front lobby to see Mother and L.O. together. Around September 13, 2019, Father came into the CFS office and demanded visits with L.O. The social worker informed Father that CFS was working on setting up separate visits for Father and L.O.

On October 7, 2019, the juvenile court took jurisdiction over L.O. on the basis of sustained allegations pursuant to section 300, subdivision (b), as alleged in the amended petition. The court dismissed the subdivision (d) (sexual abuse) allegation against Father. The court declared L.O. a dependent of the court, removed him from parental custody, and ordered reunification services for Mother and Father.

On June 10, 2020, foster parents Mr. and Mrs. C. filed a de facto parent request. By that date, L.O. had been residing with Mr. and Mrs. C. for over a year and they had provided for his daily needs.

By April 2020, CFS recommended terminating reunification services for Father and Mother due to their lack of progress and violations of the law and court order. On November 29, 2019, Father and Mother had been arrested together by border patrol agents on immigrant smuggling charges. They were again arrested together on March 8, 2020, for stealing. And, on April 20, 2020, Father and Mother were involved in a

5

domestic violence incident at a motel when Mother became upset, fled with Father's car key, and police were called. It was evident to CFS that Father and Mother were in a relationship and that Father continued to be in contact with Mother in violation of a restraining order. Father was uncooperative with CFS, blamed the social worker for his failure to comply with his case plan and restraining order, was homeless and unemployed, and refused to give the social worker an address for where he was residing. He stated that he had no family support in California as his parents resided in Japan. CFS was concerned that Father had failed to take responsibility for his actions and had not shown to have benefitted from services.

However, by June 2020, Father had made progress in his case plan, and CFS recommended additional services for Father. He had maintained consistent contact with L.O., and his interactions with L.O. were appropriate. On June 4, 2020, Father contacted the social worker and stated that he had completed his individual counseling and only had one more parenting class and domestic violence class. Father's therapist confirmed his progress and noted that he was "highly motivated and focused." Father was staying in a hotel provided for by the Veterans Affairs (VA). Due to this new information, CFS opined that it was appropriate to offer Father six additional months of services so that he may obtain employment and maintain stability to show that he can support, protect, and provide for his child. CFS continued to recommend terminating reunification services to Mother as her whereabouts remained unknown.

At the six-month review hearing on June 16, 2020, Father's counsel submitted on the recommendation and requested unsupervised visits. Mother's counsel requested to set the matter for contest, and a contested hearing was scheduled for August 11, 2020.

By August 2020, Father continued to reside in a motel funded by the VA. Father reported that he was collecting unemployment and was awaiting low-income housing. He inquired with the social worker if Mother was allowed to live with him in the low-income housing and noted that the restraining order was set to expire in October 2020. Father also stated that he and Mother would discuss plans for their relationship and that he wanted Mother to babysit L.O. The social worker was concerned that Father did not think about what was in the best interest of his child and was further concerned that Father's choice to have Mother live with him would continue to place L.O. at risk. The social worker recommended that any unsupervised visitation with Father and L.O. occur only at a CFS office.

At the contested six-month review hearing on August 11, 2020, the juvenile court provided the parents with an additional six months of services. The court granted Father unsupervised visits at the CFS office. The court also granted Mr. and Mrs. C.'s request for de facto parent status. The court noted that because the date for the 12-month review hearing had passed, this hearing would be considered a combined six-month and 12-month review hearing. The court thus set an 18-month review hearing for October 1, 2020.

By October 1, 2020, the parents had not identified any new family members L.O. may be placed with.  Father continued to report that his mother lived out of the country but noted that his brother may be coming to reside with him in California.  Father was still residing in motels provided for by the VA while he waited for low-income housing.  He was unemployed but had recently attended a hiring event and continued to collect unemployment.  As of June 13, 2020, Father had completed all of his case plan services.  However, when questioned about his current ability to take care of L.O., Father stated that he could take care of him as long as Mother could take him when he obtained employment.  When the social worker reminded Father about the restraining order and the issues with their relationship, he did not appear to understand the severity, responding that the best option was for L.O. to stay with Mother and Father could pick him up after work.

Based on Father's financial information in the low-income housing application, it was apparent that Father provided Mother with financial support and that they maintained a relationship.  Father, however, indicated that he had called Mother on August 18, 2020, and told her that they could not be together because he could not afford to lose his son.  He acknowledged that he was not supposed to speak to Mother.  Father also stated that his brother may be moving in with him and that he would try to work during the hours that his brother could watch L.O.  Due to concerns with Father and Mother's ongoing relationship, instability, risks of domestic violence, and inability to assume full responsibility for L.O. within the next six months, CFS recommended that reunification

8

services be terminated to both Mother and Father and that a section 366.26 hearing be set to establish a permanent plan of adoption for L.O. The scheduled October 1, 2020 18-month review hearing was continued to November 30, 2020, for contest.

By November 19, 2020, Father resided in a temporary hotel while waiting for approval for low-income housing and continued to consistently visit L.O. He was looking for stable employment, but in the meantime was delivering food for a food delivery service. When questioned about his plans to take care of L.O. if he was returned to his custody, Father stated that he would move in with his sister, though he had never mentioned his sister before. Father reported that he had a twin sister who resided in a studio apartment with her boyfriend, and his sister could watch L.O. when she was not working. Father's VA case manager confirmed that Father was awaiting housing and that Father continued to engage in mental health services through the VA.

The contested 18-month review hearing set for November 30, 2020, was continued once more to January 12, 2021, due to the sudden unavailability of an attorney assigned to the case.

By January 5, 2021, Father continued to search for housing and receive unemployment benefits. He also continued to consistently visit L.O. at the CFS office. Father reported that his brother and nephews were included on his housing voucher and that they planned to move in with Father. However, the social worker noted that the live scan paperwork, which was sent to Father's brother in November 2020, had not been returned.

9

The contested 18-month review hearing was held on January 12, 2021. After hearing testimony and argument from all counsel, the juvenile court noted that there was a clear suspicion that Father and Mother were together, though all evidence of their relationship was dated at least six months prior. As such, the court decided to allow both Mother and Father to continue reunification services until the section 366.25 permanency review hearing scheduled for March 25, 2021. Since the criminal restraining order that prohibited contact between Father and Mother had expired in October 2020, the court issued its own no-contact order for Father and Mother.

In March 2021, CFS reported that Father's unsupervised visits were moved to locations outside of the CFS office. CFS explained that visits were moved outside of the office so that Father could have the opportunity to demonstrate that he can be outside of a controlled environment and still follow court orders and provide for the safety of L.O. Father's visits were reported to be consistent and appropriate. CFS also reported that Father was in the final stages of finding housing and should be able to move into his new home within a few weeks. Father had also found stable employment. Father stated that his brother would assist with childcare if L.O. was returned to him and that he had no plans to continue a relationship with Mother. CFS recommended continued services for Father under a plan of permanent placement with the goal of L.O. returning to Father. CFS noted that Father needed additional time to secure housing, stabilize himself, prove he could manage L.O. safely outside of a controlled environment, and prove that he was

able and willing to remain separated from Mother for the long term. Neither Father nor Mother had identified any new family members to consider as placement options for L.O.

Mother, on the other hand, continued to show poor insight, disobeyed house rules, repeatedly left her foster home, returned two hours after her curfew and ignored the foster mother's attempts to contact her, continued to disrespect others in the house, and failed to exhibit independent living skills. CFS noted concerns that Mother was unable to demonstrate that she could behave appropriately without supervision or that she could prioritize the needs of her child over her own. Mother was not looking for a job but appeared to have a lot of money and did not disclose where she got the money. CFS thus recommended that Mother's services be terminated.

At the section 366.25 hearing on March 25, 2021, after hearing argument from counsel, the court found no likelihood of return of L.O. to Mother and terminated Mother's reunification services. The court agreed to extend services for Father, finding a likelihood that L.O. could be returned to Father. The court granted Father unsupervised visits with L.O. and ordered that Mother was not to be present. A permanent plan review hearing was scheduled for September 24, 2021.

By September 2021, Father had moved into his home in late April 2021. He had also completed all of his case plan services. However, CFS remained concerned with Father's inability to follow the court's no-contact order with Mother. CFS reported coincidences that led to a suspicion that Father and Mother were having contact with one another. CFS noted that on May 12, 2021, Mother had a scheduled supervised visit with

11

L.O. at the CFS office. After the visit, the social worker witnessed Father pick up Mother from the store next door to the office. The social worker was able to identify Father in the car and later was also able to match his license plate to the car that picked up Mother. On May 19, 2021, the social worker again witnessed Father pick up Mother from the store parking lot next to the CFS office following one of her supervised visits with L.O.

In June 2021, L.O.'s foster parents also began to suspect that Father and Mother were visiting L.O. together. In July 2021, L.O.'s foster mother reported that after she met Father to drop off L.O. she saw Mother standing at the corner of a residential street frequented by Father. Due to Mother's distinctive tattoos and the foster mother's substantial interactions with Mother, the foster mother stated that there was no question that it was Mother that she saw. Moreover, L.O., who was two years old by this time and verbal, indicated that Father and Mother were visiting him together. On one occasion, when Father was placing L.O. in the foster mother's vehicle following an unsupervised visit, the foster mother heard L.O. continually ask Father "where mom go?" The foster mother stated that there was no confusion regarding who L.O. was talking about as he only calls Mother "mom" and calls her (foster mother) "mama." In addition, L.O. continued to talk about Mother following visits with Father and identified his supervised visits at the CFS office as with "mom" and identified his unsupervised visits as with "dad and mom." While she originally thought L.O. may have been confused, the foster mother reported that L.O. was adamant and consistent about "mom" being at Father's unsupervised visits.

When confronted with these concerns, Father denied all allegations that he was in contact with Mother. CFS remained concerned that Father was unable to follow the court's no-contact order, despite knowing that having contact with Mother could cause him to lose his son. CFS opined that due to Mother's "ongoing concerning and dangerous" behaviors and Father's "significant struggle with protective capacities," L.O. would continue to be at risk for significant harm and neglect if he were placed in Father's care.[5] CFS thus recommended that Father's reunification services be terminated and a section 366.26 hearing be set to establish a permanent plan of adoption for L.O. L.O. had been placed with his foster parents since May 2019 and was attached to them. The foster parents were mutually attached to L.O. and desired to adopt L.O. and provide him with permanency and stability.

At the scheduled September 24, 2021 section 366.3 hearing, after Father's counsel requested to set the matter for contest, the juvenile court scheduled a contested hearing for October 18, 2021. In the interim, Father's visits were reverted to supervised once a week for two hours.

On October 13, 2021, CFS informed the juvenile court that PGM was approved to participate in a portion of Father's supervised visits. The social worker spoke with PGM on October 12, 2021. PGM admitted that this was the first time she had met L.O., although she had seen him in video chats. The social worker noted that PGM was

[5] Mother continued to engage in sex trafficking behaviors, was arrested by the San Diego Human Trafficking Unit with her minor sister, and had a large amount of cash in her possession. Mother's dependency case was dismissed in August 2021 when she turned 18.

13

unclear about what she wanted and made conflicting statements as to placement of L.O. in her care. PGM stated that she was in California to visit so L.O. could get to know her, but then said she came because "you guys wanted me to show up so I am here." PGM noted that she lived in Japan and was only in California for the hearing. She also claimed that she had reached out numerous times regarding placement of L.O., but neither the current social worker nor the previous one ever received any communication from her. The social worker reported that PGM may have reached out at the inception of the case in 2019 and was told she needed to come to California to complete live scan fingerprinting; however, since she lived in Japan and the parents were participating in reunification services in California, placement would not have been possible in Japan. PGM admitted that she never pursued placement as she believed Father would reunify with L.O. and it would be a waste of time to come to California to seek placement.

However, once Father informed PGM that the recommendation was to terminate services, she and her husband flew out on an emergency leave basis as her husband was in the military. When asked what it would look like for PGM to have placement of L.O. and the location of the placement, PGM did not have a response. She indicated her current housing was "temporary" and not "long-term" and that financials were an issue. PGM could not identify or describe any stable plan for placement of L.O. and did not know how long she could stay in California or where she would stay. She also had reservations about placing L.O. in her care in Japan because she did not know how long she would be living in Japan. The social worker opined that placement with PGM would

14

be very concerning at this point as she made minimal efforts to obtain placement, was unable to demonstrate stability, and was unable to verbalize a plan for placement of L.O. in her care.

By October 2021, CFS also recommended that the juvenile court reduce both parents' visitations due to the harm visits have had on L.O.'s emotional stability. CFS reported that over the previous month, L.O. had struggled with tantrums and aggression, including kicking, biting, and hitting, due to not wanting to go to visits with Father and Mother.

The contested section 366.3 hearing was held on October 18, 2021. Following admission of evidence, testimony from Father and the social worker, and argument from all counsel, the juvenile court considered the factors under section 361.3 and ruled out PGM's request to be considered for placement. The court further found, by a preponderance of the evidence, that custody by Father continued to be detrimental to L.O. The court terminated Father's reunification services and set a hearing under section 366.26. Father timely filed a notice of intent to file a writ petition.

## III

## DISCUSSION

A.  *Detriment Finding*

Father contends the juvenile court erred in not returning L.O. to his care at the section 366.3 permanency planning review hearing because the court's finding of detriment was not supported by substantial evidence. We disagree.

Section 366.25 governs cases in which reunification services have been extended to 24 months. At a 24-month review hearing, the juvenile court must order the return of a child to the parent's physical custody unless the court finds by a preponderance of the evidence that the child's return would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. (§ 366.25, subd. (a)(1).) If the child is not returned to his or her parent at the 24-month review hearing, the juvenile court must set a section 366.26 hearing. (§ 366.25, subd. (a)(3).)

Here, at the section 366.25 review hearing in March 2021, the juvenile court found that return of custody of L.O. to Father continued to be detrimental to L.O. The court, however, did not terminate Father's services and ordered a permanent plan of placement in foster care with a permanent plan of return home to Father. The court found a compelling interest for determining that a section 366.26 hearing was not in L.O.'s best interest and that it was in L.O.'s best interest to offer Father an additional six months of services under the permanent plan.

"Once a permanent plan is selected, however, the case moves into the post-permanency stage, . . . If a plan other than adoption is selected, and parental rights are not terminated, the availability of reunification services is determined thereafter under section 366.3. . . ." (*D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017, 1038; see § 366.3.) Section 366.3 provides for a status review at least every six months in the case of a child placed in long-term foster care. (§ 366.3, subd. (d).) "The statutory scheme ensures that efforts are continuously being made to find a more permanent placement for

16

a child in long-term foster care." (*M.T. v. Superior Court* (2009) 178 Cal.App.4th 1170, 1178.) The legislative preference is "for adoption over legal guardianship over long-term foster care." (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888.)

Section 366.3, subdivision (f), provides that where parental rights have not been terminated: "It shall be presumed that continued care is in the best interests of the child, unless the parent or parents prove, by a preponderance of the evidence, that further efforts at reunification are the best alternative for the child. In those cases, the court may order that further reunification services to return the child to a safe home environment be provided to the parent or parents up to a period of six months, and family maintenance services, as needed for an additional six months in order to return the child to a safe home environment."

Section 366.3 also provides that at a postpermanency planning review hearing, the juvenile court "shall order" a section 366.26 hearing "unless it determines by clear and convincing evidence that there is a compelling reason for determining that a hearing held pursuant to Section 366.26 is not in the best interest of the child because the child is being returned to the home of the parent, the child is not a proper subject for adoption, or no one is willing to accept legal guardianship as of the hearing date." (§ 366.3, subd. (h)(1); see *M.T. v. Superior Court*, *supra*, 178 Cal.App.4th at p. 1180.) The statute thus does not require the juvenile court to make a finding of detriment in order to set a section 366.26 hearing at a postpermanency planning review hearing, even though the

17

juvenile court made such finding at the section 366.3 hearing. Father does not argue or suggest that it was not in L.O.'s best interest to set a section 366.26, and there is no evidence to suggest otherwise. L.O. had been placed with his foster parents when he was two months old and is now two years old. L.O. has been in the care of his foster parents, who desired to adopt him and provide him with stability and permanency, nearly all of his young life.

Although Father challenges a finding of detriment in his writ petition, the juvenile court here was not required to make a detriment finding when it ordered the section 366.26 hearing. Father's challenge to the order on that basis thus fails. Even if a detriment finding was required, there is substantial evidence to support the juvenile court's detriment finding.

"We review the juvenile court's finding of detriment for substantial evidence." (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864 (*Georgeanne G.*).) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Substantial evidence supports the juvenile court's finding of detriment. Although Father is correct that he had completed his case plan, he nonetheless continued to

18

maintain a relationship with Mother and had contact with Mother, despite the no contact order and Mother's risk to L.O. He had repeatedly allowed Mother to attend his unsupervised visits with L.O., despite Mother continuing to engage in reckless, dangerous, and irresponsible behaviors and her lack of insight into how her behavior posed a risk to L.O. There was ample evidence in the record that a relationship with Mother would pose a risk to L.O. and that L.O. continued to be at risk of exposure to Mother. Father continued to deny having a relationship with Mother, but he was seen with Mother at visits by the social worker, as well as the foster mother. Moreover, L.O. indicated to the foster mother that Mother attended Father's unsupervised visits. There was also evidence in the record to show that Father provided for Mother's financial needs. Contrary to Father's claim, the risk to L.O. was not theoretical.

*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646 (*M.G.*) and *Georgeanne G.*, *supra*, 53 Cal.App.5th 856, relied on by Father, are distinguishable. First, both of those cases involve a parent's challenge to a finding of detriment and termination of reunification services that occurred at the 18-month review hearing before a permanent plan was established. (See *M.G.*, at p. 649; *Georgeanne G.*, at p. 858.) Therefore, different statutes and statutory presumptions were applicable in those cases that are not applicable to this case. (See *M.G.*, at p. 660 [" '[A]t each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody.' "]; §366.22 subd. (a).) Further, the facts of those cases are different than the present case.

In *M.G.*, *supra*, 46 Cal.App.5th 646, the juvenile court sustained a petition as to the parents based in part on their substance abuse and domestic violence by the father and mother's boyfriend P.B. (*Id.* at pp. 650-651.) Although the mother obtained a restraining order against P.B., the court later modified the order to allow peaceful contact, and the mother planned to move in with P.B. (*Id.* at p. 654.) The mother made significant progress in addressing her substance abuse issues, but the juvenile court made a finding of detriment based on the risk P.B. posed to mother's sobriety. (*Id.* at pp. 658-659.) The Court of Appeal reversed, explaining, "The juvenile court's ruling relied on . . . vague and nebulous concerns that were not supported by evidence. The court stated it had no concerns with the parents' substance abuse. It focused on Mother's relationship with P.B., even though Mother testified she was merely friends with P.B., and her therapist testified she had no concerns about Mother's relationship with P.B. [The child welfare agency] produced no evidence contradicting that evidence. In short, the court based its concerns on a hunch that was not supported by any evidence, stating Mother's relationship with P.B. was 'a risk to you and your sobriety.' " (*Id.* at p. 662.) In contrast to *M.G.*, the juvenile court here had more than a "hunch" that Father's relationship with Mother posed a substantial risk to L.O.

Father's reliance on *Georgeanne G.*, *supra*, 53 Cal.App.5th 856 is likewise misplaced. There, the juvenile court made a finding of detriment based on the mother living with a man (Arthur) who had been convicted of raping his former wife despite there being a no-contact order in place and no evidence Arthur had engaged in any

physical or verbal abuse of the mother. (*Id*. at pp. 859, 863.) The Court of Appeal rejected the juvenile court's finding the mother's lack of insight into the risk posed by Arthur created a risk of detriment, explaining, "The Department's and the court's assessment Lucas risked exposure to family violence, even with a no-contact order or monitored visitation for Arthur, depended on two inferences: Georgeanne would violate the court order, and Arthur would commit (or was likely to commit) an act of violence against Georgeanne or perhaps Lucas. Neither essential inference had a basis in the evidence. [¶] Certainly, Arthur committed a serious act of violence against his ex-wife, for which he was convicted of a felony and placed on probation. But there was no evidence he engaged in any physical or verbal abuse toward Georgeanne during the 22 months they had been living together. Nor was there reason to believe, if violence were threatened, Georgeanne would be a passive victim and unable to protect Lucas." (*Id*. at pp. 868-869.) Further, "[w]hatever theoretical risk Arthur might pose . . . could be effectively neutralized by continuing court supervision and services while returning Lucas to Georgeanne's care." (*Id*. at p. 869.) As discussed, Father here continually violated the no contact order and had a pattern of similar conduct in the past. Although he denied having contact with Mother, he was observed numerous times with Mother by the social worker and the foster mother. L.O. also indicated Mother's attendance at Father's unsupervised visits.

Because substantial evidence supports the juvenile court's finding of detriment, the juvenile court did not err in refusing to return L.O. to Father.

21

B.    *Placement*

Father also asserts that the juvenile court erred in "refus[ing] to consider" PGM's request for assessment as a legal guardian or prospective adoptive parent at the section 366.3 hearing.  Relying on section 366.3, subdivision (h)(1), he claims that "[b]ecause the court was aware that the paternal grandmother was then, at the time of the hearing, requesting to be assessed for placement of L.O. in her care, it was error for the court to find it was in the best interest of L.O. to set a section 366.26 hearing when the court knew that paternal grandmother was willing to accept legal guardianship of L.O. as of the hearing date."  Father's claim lacks merit as he misconstrues subdivision (h) of section 366.3.

As previously discussed, section 366.3 governs postpermanency review hearings for children for whom a permanency plan has been selected, including long-term foster care.  Consistent with the Legislature's preference for a permanency plan other than long-term foster care (§ 396), the court is required to consider "all permanency planning options for the child" at a postpermanency review hearing.  (§ 366.3, subd. (h)(1).)  The court is required to consider all permanency planning options, including whether the child should be returned to the home of the parent, placed for adoption, appointed a legal guardian or placed in another planned permanent living arrangement.  (*Ibid.*)  The court must set a section 366.26 hearing unless it determines by clear and convincing evidence there is a compelling reason that a section 366.26 hearing is not in the child's best interest.  (§ 366.3, subd. (h)(1).)  A compelling reason exists when the child is being

returned to the home of the parent, the child is not a proper subject for adoption or there is no one willing to accept legal guardianship of the child.[6] (*Ibid.*)

Father appears to interpret section 366.3, subdivision (h)(1), to mean that if there is someone willing to accept legal guardianship of the child as of the hearing date, then that alone is a compelling reason that a section 366.26 hearing is not in the best interest of the child. However, the statute provides that where there is no one willing to accept legal guardianship of the child as of the hearing date, a compelling reason exists that it is not in the best interest of the child to not set a section 366.26 hearing. In fact, as explained, the juvenile court "shall order" a section 366.26 hearing "unless it determines by clear and convincing evidence that there is a compelling reason for determining that a hearing held

_____

[6] Specifically, section 366.3, subdivision (h)(1), states: "At the review held pursuant to subdivision (d) for a child in foster care, the court shall consider all permanency planning options for the child including whether the child should be returned to the home of the parent, placed for adoption, or, for an Indian child, in consultation with the child's tribe, placed for tribal customary adoption, or appointed a legal guardian, placed with a fit and willing relative, or, if compelling reasons exist for finding that none of the foregoing options are in the best interest of the child and the child is 16 years of age or older, whether the child should be placed in another planned permanent living arrangement. The court shall order that a hearing be held pursuant to Section 366.26, unless it determines by clear and convincing evidence that there is a compelling reason for determining that a hearing held pursuant to Section 366.26 is not in the best interest of the child because the child is being returned to the home of the parent, the child is not a proper subject for adoption, or no one is willing to accept legal guardianship as of the hearing date. If the county adoption agency, or the department when it is acting as an adoption agency, has determined it is unlikely that the child will be adopted or one of the conditions described in paragraph (1) of subdivision (c) of Section 366.26 applies, that fact shall constitute a compelling reason for purposes of this subdivision. Only upon that determination may the court order that the child remain in foster care, without holding a hearing pursuant to Section 366.26. The court shall make factual findings identifying any barriers to achieving the permanent plan as of the hearing date. The nonminor dependent's legal status as an adult is in and of itself a compelling reason not to hold a hearing pursuant to Section 366.26."

pursuant to [s]ection 366.26 is not in the best interest of the child because the child is being returned to the home of the parent, the child is not a proper subject for adoption, or no one is willing to accept legal guardianship as of the hearing date." (§ 366.3, subd. (h)(1); see *M.T. v. Superior Court*, *supra*, 178 Cal.App.4th at p. 1180.)

PGM's request to be assessed for placement after over two years since L.O.'s removal, detention, and placement with his foster parents is not a compelling reason to not set a section 366.26 hearing. Rather, the record demonstrates that it was in L.O.'s best interest to schedule a section 366.26 hearing. The foster parents had provided for L.O.'s daily needs for the past two years and desired to adopt him prior to PGM's request to be assessed as a legal guardian or prospective adoptive parent.

To the extent that Father is implying that the juvenile court erred in "refusing to consider" PGM's request for placement under section 361.3, he has waived such argument by failing to assert it in his petition. "Courts will ordinarily treat the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge. [Citation.]" (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685; see *Nemarnik v. Los Angeles Kings Hockey Club* (2002) 103 Cal.App.4th 631, 638, fn. 3 ["[a] party's failure to raise an issue below and in its opening brief constitutes a waiver"]; *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [failure to raise issue on appeal constitutes waiver]; *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 368 [failure to raise issue in opening brief waives issue on appeal].)

Even if he raised the argument, the juvenile court here considered PGM's request

24

and rejected it under the factors listed in section 361.3.  In determining where to place a child removed from the physical custody of his or her parents, preferential consideration is given to relatives.  However, placement with a relative is neither required nor guaranteed.  (§ 16519.5, subd. (c)(6).)

" 'Section 361.3 gives "preferential consideration" to a relative's request for placement, which means "that the relative seeking placement shall be the first placement to be considered and investigated."  (§ 361.3, subd. (c)(1).)'  [Citation.]  'When considering whether to place the child with a relative, the juvenile court must apply the [section 361.3] placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement.'  [Citation.]"  (*In re A.K.* (2017) 12 Cal.App.5th 492, 498; accord, *In re Isabella G.* (2016) 246 Cal.App.4th 708, 719.)

"The relative placement provisions in section 361.3 apply when a child is taken from her parents and placed outside the home pending the determination whether reunification is possible.  [Citation.]  The relative placement preference also applies to placements made after the dispositional hearing, even when reunification efforts are no longer ongoing, whenever a child must be moved.  (§ 361.3, subd. (d); [citation].)"  (*In re A.K.*, *supra*, 12 Cal.App.5th at p. 498.)

Here, the juvenile court found that there was lack of relationship, effort, and involvement by PGM.  The court also determined that there was a need for stability and permanency for L.O.  L.O.'s need for stability and permanency after over two years since

25

the dependency proceedings commenced weighed in favor of ruling out PGM's request to be assessed for placement. The juvenile court thus did not err in refusing to order a placement assessment for PGM at the section 366.3 hearing.

## IV

## DISPOSITION

The writ petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
      Acting P. J.

MILLER
      J.